KRISTEN CLARKE, Assistant Attorney General
CARRIE PAGNUCCO, Chief
MICHAEL S. MAURER, Deputy Chief
MAX LAPERTOSA, Trial Attorney
NATHAN SHULOCK, Trial Attorney
United States Department of Justice, Civil Rights Division
Housing and Civil Enforcement Section
950 Pennsylvania Avenue, N.W. – 4CON
Washington, DC 20530
Tel.: (202) 598-9726; Fax: (202) 514-1116
Max.Lapertosa@usdoj.gov
Nathan.Shulock@usdoj.gov

CLARE E. CONNORS, United States Attorney
SYDNEY SPECTOR, Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, HI 96850
Tel.: (808) 541-2850; Fax: (808) 541-3752
Sydney.Spector@usdoj.gov

Attorneys for Plaintiff, United States of America

(Other counsel listed on signature page)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br> v.<br><br>ALBERT C. KOBAYASHI, INC., MARTIN V. COOPER, DESIGN PARTNERS, INC., MICHAEL N. GOSHI, FRITZ JOHNSON, INC., FREDERICK M. JOHNSON, STANFORD CARR DEVELOPMENT, LLC, SCD WAILEA FAIRWAYS, LLC, SATO & ASSOCIATES, INC., FUKUMOTO ENGINEERING, INC. (formerly Ronald M. Fukumoto Engineering Inc.), ROJAC CONSTRUCTION INC., DELTA CONSTRUCTION CORP., WARREN S. UNEMORI ENGINEERING, INC., GYA ARCHITECTS, INC., and GOODFELLOW BROS. LLC,<br><br>     Defendants,<br><br> and<br><br>NAPILIHAU VILLAGES ASSOCIATION OF APARTMENT OWNERS, NAPILI VILLAS HOA, INC., AOAO WAILEA FAIRWAY VILLAS, KAHULUI TOWN TERRACE LP, and PALEHUA APARTMENTS LP,<br><br>     Rule 19 | No. 19-00531 LEK-RT<br><br>**CONSENT ORDER** |

Defendants.

## CONSENT ORDER

## I.    INTRODUCTION

1.     The United States brought this action to enforce provisions of the Fair

Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619.  Specifically, the United States'

complaint alleges that Defendants have engaged in a pattern or practice of

discrimination and denied rights protected by the FHA to a group of persons

because of disability by failing to design and construct these covered multifamily

dwellings (the "Subject Properties") with the features of accessible and adaptive

design and construction required by the FHA, 42 U.S.C. §§ 3604(f)(1), (f)(2), and

(f)(3)(C):

    a.    Napilihau Villages ("Napilihau"), Lahaina, Hawaii

    b.    Napili Villas ("Napili"), Lahaina, Hawaii

    c.    Wailea Fairway Villas ("Wailea Fairway"), Kihei, Hawaii

    d.    Kahului Town Terrace ("Kahului"), Kahului, Hawaii

    e.    Palehua Terrace Phase I ("Palehua Terrace"), Kapolei, Hawaii

**A.    Defendants**

2.     As used herein, "Defendants" means the following parties:

a.      Defendant Albert C. Kobayashi, Inc., a Hawaii for-profit corporation that was the general contractor for and participated in the design and/or construction of all the Subject Properties.

b.      Defendant Martin V. Cooper, an architect residing in Hawaii who participated in the design and/or construction of Napilihau.

c.      Defendant Design Partners, Inc., a Hawaii for-profit corporation and architecture firm that participated in the design and/or construction of Napili and Wailea Fairway.

d.      Defendant Michael N. Goshi, an architect residing in Hawaii who participated in the design and/or construction of Napili and Wailea Fairway.

e.      Defendant Fritz Johnson, Inc., a Hawaii for-profit corporation and an architecture firm that participated in the design and/or construction of Palehua Terrace.

f.      Defendant Frederick M. Johnson, an architect residing in Hawaii who participated in the design and/or construction of Palehua Terrace.

g.      Defendant Stanford Carr Development, LLC (formerly SCD International, LLC), a for-profit Hawaii company that participated in the design and/or construction of Wailea Fairway.

h.      Defendant SCD Wailea Fairways, LLC, a terminated Hawaii for-profit company that participated in the design and/or construction of Wailea Fairway.

i.       Defendant Sato & Associates, Inc., a Hawaii for-profit corporation and a civil engineering firm that participated in the design and/or construction of Wailea Fairway.

j.      Defendant Fukumoto Engineering, Inc., (formerly Ronald M. Fukumoto Engineering, Inc.), a Hawaii for-profit corporation and civil engineering firm that participated in the design and/or construction of Napili.

k.      Defendant Rojac Construction Inc., a Hawaii for-profit corporation and construction firm that participated in the design and/or construction of Napili.

l.      Defendant Delta Construction Corp., a Hawaii for-profit corporation and construction firm that participated in the design and/or construction of Palehua Terrace.

5

m.      Defendant Warren S. Unemori Engineering, Inc., a Hawaii for-

profit corporation and civil engineering firm that participated in the design

and/or construction of Napilihau.

n.      Defendant GYA Architects, Inc. (formerly Gima, Yoshimori &

Associates, A.I.A., Inc.), a Hawaii for-profit corporation and architecture

firm that participated in the design and/or construction of Kahului.

o.      Defendant Goodfellow Bros. LLC (formerly Goodfellow Bros.

Construction, LLC and Goodfellow Bros., Inc.), a Washington for-profit

company registered to do business in Hawaii that participated in the design

and/or construction of Napilihau and Wailea Fairway.

**B.      Rule 19 Defendants**

3.      As used herein, "Rule 19 Defendants" means Napilihau Villages

Association of Apartment Owners, Napili Villas HOA, Inc., AOAO Wailea

Fairway Villas, Kahului Town Terrace LP, and Palehua Apartments LP.  These

entities have ownership and/or management interests in the Subject Properties.  As

such, they have been named in this lawsuit solely under Federal Rule of Civil

Procedure 19 as necessary parties in whose absence complete relief cannot be

afforded to the United States.

**C.      Subject Properties**

4.      Napilihau is a multifamily condominium complex located at 4955
Hanawai Street in Lahaina, Hawaii.  Napilihau consists of nine two-story buildings
without elevators.  Eight buildings have eight units and one building has 12 units.
Napilihau has 38 ground-floor units.  Napilihau also has public and common use
areas, including a barbeque area, a pet waste station, mailboxes, trash facilities, and
parking lots.

5.      Napili is a multifamily condominium complex located on Polohina
Lane, Punohu Lane, and Ki Ohu Ohu Lane in Lahaina, Hawaii.  Napili consists of
26 two-story buildings without elevators.  Napili has 80 single-story ground-floor
units.  Napili also has public and common use areas, including mailboxes, trash
facilities, and parking lots.

6.      Wailea Fairway is a multifamily condominium complex located at
3950 Kalai Waa Street in Kihei, Hawaii.  Wailea Fairway has 24 two-story
buildings without elevators and 46 single-story ground-floor units.  Wailea
Fairway has also public and common use areas, including a clubhouse/recreation
center, a pool, a carwash station, mailboxes, trash facilities, and parking lots.

7.      Kahului is a multifamily apartment complex located at 170 Ho'ohana
Street in Kahului, Hawaii.  Kahului has four buildings with multiple floors and no
elevators.  In three buildings, on the first floor is a parking garage, and above the

garage there are two floors of units.  Kahului has 36 ground-floor units.  Kahului also has public and common use areas, including a management office, a playground, mailboxes, trash facilities, and parking lots.

8.    Palehua Terrace is a multifamily apartment complex located at 92-1118 Palahia Street in Kapolei, Hawaii.  Palehua Terrace consists of seven two-story buildings without elevators.  The buildings are situated one story below grade level, with the second story connected to the complex's sidewalks, parking lots, and road by pedestrian bridges.  Palehua Terrace has 42 ground-floor units.  Palehua Terrace also has public and common use areas, including a picnic area, mailboxes, trash facilities, and parking lots.

### D.    Relevant Requirements of the FHA

9.    The FHA provides that, for non-elevator residential buildings with four or more dwelling units, all ground-floor units that are designed and constructed for first occupancy after March 13, 1991, are "covered multifamily dwellings" and must include certain basic features of accessible and adaptive design to make such units accessible to or adaptable for use by a person who has or develops a disability.  42 U.S.C. §§ 3604(f)(3)(C) and (f)(7)(B).

10.    The accessible and adaptive design provisions of the FHA require that covered multifamily dwellings be designed and constructed for first occupancy so

8

that:  (i) the public use and common use portions of such dwellings are readily

accessible to and usable by persons with a disability; (ii) all the doors designed to

allow passage into and within all premises within such dwellings are sufficiently

wide to allow passage by persons with a disability using wheelchairs; (iii) all

premises within such dwellings contain the following features of adaptive design:

(I) an accessible route into and through the dwelling; (II) light switches, electrical

outlets, thermostats, and other environmental controls in accessible locations; (III)

reinforcements in bathroom walls to allow later installation of grab bars; and (IV)

usable kitchens and bathrooms such that an individual using a wheelchair can

maneuver about the space.  42 U.S.C. § 3604(f)(3)(C).  These features are referred

to herein as the "Accessible Design Requirements."

11.    The United States and Defendants agree that the Subject Properties

were designed and constructed for first occupancy after March 13, 1991, and that

the ground-floor units with single-story interiors are "covered multifamily

dwellings" within the meaning of the FHA, 42 U.S.C. § 3604(f)(7)(A) and (B).  As

such, those units, the routes, and the public and common use areas were required to

be designed and constructed for first occupancy in compliance with the Accessible

Design Requirements.

12.    The United States and Defendants agree that Rule 19 Defendants Napilihau Villages Association of Apartment Owners, Napili Villas HOA, Inc., AOAO Wailea Fairway Villas, and Kahului Town Terrace LP were not involved in the design or construction of the Subject Properties for first occupancy, and therefore are not required to remediate any violations of the design and construction provisions of the FHA, 42 U.S.C. § 3604(f)(3)(C).  Defendants allege that Rule 19 Defendant Palehua Apartments LP was involved in the design and/or construction for first occupancy of Palehua Terrace; however, the United States has not claimed in this case that Palehua Apartments violated 42 U.S.C. § 3604(f).

**E.    Consent of the Parties to this Order**

13.    The Parties agree that this Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 3614(a) and that venue in this District is proper under 28 U.S.C. § 1391.

14.    Defendants deny the allegations in the Second Amended Complaint. This Consent Order does not constitute an admission of liability on the part of any of the Defendants, and not all of the Defendants are alleged to have participated in the design and/or construction of every Subject Property.  Nevertheless, the Parties agree that this case should be resolved amicably and without trial or further proceedings.

15.     Defendants agree, subject to the terms and conditions contained herein, to make certain specified retrofits to the Subject Properties to remedy accessibility barriers that violate the FHA, as set forth in this Order.  Rule 19 Defendants agree to permit the retrofitting and inspecting of the Subject Properties as set forth in this Order.

16.     This Order binds all parties to the full and final resolution described herein of all actual and potential interests, allegations, defenses, claims, counterclaims, and relating to the subject matter of the disputes that have been or could have been raised under the FHA.

Therefore, it is hereby ORDERED and ADJUDGED as follows:

## II.     GENERAL INJUNCTION

17.     Defendants and each of their officers, employees, agents, successors and assigns, and all other persons in active concert or participation with them, are enjoined from discriminating on the basis of disability as prohibited by the FHA, 42 U.S.C. §§ 3604(f)(1) – (3).

18.     Defendants and each of their officers, employees, agents, successors and assigns, and all other persons in active concert or participation with them, are enjoined from interfering with or preventing the retrofitting ordered herein or the implementation or completion of provisions required by this Order.

19.    Rule 19 Defendants and each of their officers, directors, employees, managing agents, successors and assigns, and all other persons in active concert or participation with them, are enjoined from interfering with or preventing the retrofitting ordered herein or the implementation or completion of provisions required by this Order.  Rule 19 Defendants agree to allow reasonable access to the public and common use areas of the Subject Properties upon thirty (30) days' advance written notice, and, to the extent authorized by applicable law, access to unit interiors at the Subject Properties, for the purpose of planning, evaluating, and performing any action required under this Order to bring the public and common use areas and the unit interiors into compliance with the FHA and for the purpose of interviewing or meeting with residents or unit owners to aid in the implementation or completion of this Order.  For Palehua Terrace and Kahului, Defendants shall provide 45 days' advance written notice to the owners and any tenants and/or occupants whose units shall be retrofitted.  For unit owners and residents of Napilihau, Napili, and Wailea Fairway, notice shall be provided consistent with the process set forth in Section IV, *infra*.

## III.    RETROFITS AT THE SUBJECT PROPERTIES

20.    As soon as reasonably possible, but in any event by no later than seventy-two (72) months from the entry of this Order, Defendants Albert C.

Kobayashi, Inc., Martin V. Cooper, Warren S. Unemori, Inc., and Goodfellow

Bros. LLC will complete the retrofits to the public and common areas at Napilihau

as described in Appendix A.1 to this Order.[1]

21.    As soon as reasonably possible, but in any event by no later than

thirty-six (36) months from the entry of this Order, Defendants Albert C.

Kobayashi, Inc., and Martin V. Cooper will complete the retrofits to the covered

units at Napilihau as described in Appendix A.2 to this Order, subject to the terms

in Section IV and to any extension of time if necessary pursuant to Section XV,

*infra*.

22.    As soon as reasonably possible, but in any event by no later than

seventy-two (72) months from the entry of this Order and subject to any extension

of time if necessary pursuant to Section XV, *infra*, Defendants Albert C.

Kobayashi, Inc., Design Partners, Inc., Michael N. Goshi, Fukumoto Engineering,

Inc., and Rojac Construction Inc. will complete the retrofits to the public and

common use areas at Napili as described in Appendix B.1 to this Order.

23.    As soon as reasonably possible, but in any event by no later than

thirty-six (36) months from the entry of this Order, Defendants Albert C.

---

[1]  As used in paragraphs 20-30, the term "As soon as reasonably possible"
does not require Defendants to begin planning or completing retrofits during the
first thirty (30) days after this Order is entered by the Court.

Kobayashi, Inc., Design Partners, Inc., and Michael N. Goshi will complete the
retrofits to the covered units at Napili as described in Appendix B.2 to this Order,
subject to the terms in Section IV and to any extension of time if necessary
pursuant to Section XV, *infra*.

24.    As soon as reasonably possible, but in any event by no later than
seventy-two (72) months from the entry of this Order and subject to any extension
of time if necessary pursuant to Section XV, *infra*, Defendants Albert C.
Kobayashi, Inc., Design Partners, Inc., Michael N. Goshi, Stanford Carr
Development, LLC, SCD Wailea Fairways, LLC,[2] Sato & Associates, and
Goodfellow Bros. LLC will complete the retrofits to the public and common use
areas at Wailea Fairway as described in Appendix C.1 to this Order.

25.    As soon as reasonably possible, but by no later than thirty-six (36)
months from the entry of this Order, Defendants Albert C. Kobayashi, Inc., Design
Partners, Inc., Michael N. Goshi, Stanford Carr Development, LLC, and SCD
Wailea Fairways, LLC will complete the retrofits to the covered units at Wailea
Fairway as described in Appendix C.2 to this Order, subject to the terms in Section
IV and to any extension of time if necessary pursuant to Section XV, *infra*.

---

[2]  As alleged in the Second Amended Complaint (ECF No. 422), SCD
Wailea Fairways is a terminated Hawaii corporation.

26.    As soon as reasonably possible, but by no later than seventy-two (72) months from the entry of this Order, Defendants Albert C. Kobayashi, Inc., Fritz Johnson, Inc., and Frederick M. Johnson will complete the retrofits to the public and common use areas at Palehua Terrace as described in Appendix D.1 to this Order.

27.    Nothing in this Consent Order shall operate to waive or discharge any claims by Defendant Albert C. Kobayashi, Inc., or Rule 19 Defendant Palehua Apartments LP, against Defendant Delta Construction Corp. arising from the facts, circumstances, and allegations contained in the United States' Second Amended Complaint in this action.

28.    As soon as reasonably possible, but by no later than sixty (60) months from the entry of this Order and subject to any extension of time under Section XV, *infra*, Defendants Albert C. Kobayashi, Inc., Fritz Johnson, Inc., and Frederick M. Johnson will complete the retrofits to the forty-two (42) covered units at Palehua Terrace as described in Appendix D.2 to this Order; provided that, within twenty-four (24) months of the effective date of this Order, these Defendants shall have completed these retrofits to twelve (12) of the covered units at Palehua Terrace; and within forty-eight (48) months of the effective date of this

Order, these Defendants shall have completed these retrofits to thirty (30) of the

covered units at Palehua Terrace.

29.     As soon as reasonably possible, but by no later than seventy-two (72)

months from the entry of this Order, Defendant Albert C. Kobayashi, Inc. will

complete the retrofits to the public and common use areas at Kahului as described

in Appendix E.1 to this Order.

30.     As soon as reasonably possible, but by no later than thirty-six (36)

months from the entry of this Order and to any extension of time if necessary

pursuant to Section XV, *infra*, Defendant Albert C. Kobayashi, Inc. will complete

the retrofits to the covered units at Kahului as described in Appendix E.2 to this

Order.

31.     Within sixty (60) days of the effective date of this Order, Defendant

GYA Architects, Inc., shall pay Albert C. Kobayashi, Inc. an amount, to be agreed

upon by GYA Architects and Albert C. Kobayashi, Inc., in consideration for Albert

C. Kobayashi, Inc., agreeing to make the retrofits to Kahului in Appendices E.1

and E.2.  Following this payment, Albert C. Kobayashi, Inc., shall be solely

responsible for the completion of retrofits to Kahului in Appendices E.1 and E.2

under this Order.  Albert C. Kobayashi, Inc., shall notify counsel for the United

States in writing that GYA Architects has made this payment in compliance with

this paragraph.  Unless and until GYA Architects, Inc., makes this payment, GYA

Architects, Inc. shall remain jointly and severally liable for retrofits to Kahului

under Paragraphs 29 and 30 of this Order.

32.    Defendants shall complete all work, or shall have all work completed,

in a workmanlike manner using only licensed and bonded contractors and shall

restore the areas affected by the retrofits to their previous condition and appearance

as much as reasonably possible and consistent with accepted building and

construction standards for multifamily properties in the state of Hawaii.

Defendants shall endeavor to minimize, as much as reasonably possible, any

burden on the Rule 19 Defendants and unit owners, tenants, and occupants in the

completion of the work set forth above.  Each Rule 19 Defendant shall designate

an individual to serve as the point of contact for the relevant Defendants to assist in

coordinating access to public and common use areas of the Subject Properties and,

to the extent authorized by applicable law, access to unit interiors for the purpose

of planning, evaluating, and performing the retrofits required to be made under this

Order.

33.    All retrofits or features required to be made in Appendices A-E shall

comply with the applicable requirements of the Fair Housing Accessibility

Guidelines, 56 Fed. Reg. 9,472-9,515 (Mar. 6, 1991), as well as any other

applicable state and local codes, ordinances, and regulations regarding building construction, repairs, and improvements.

34.    Defendants shall make their best efforts to ensure that all retrofits shall be "consistent" (as this term is defined below) in appearance with the surrounding finishes, subject to availability, and installed in a workmanlike manner consistent with accepted building and construction standards.  "Consistent," as used herein, shall be defined as having similar appearance, color, gloss or sheen, and texture, including but not limited to adhesives, veneers, or laminates in the event of alterations made to existing countertops, cabinets, or flooring.  Subject to these provisions, Defendants will not be required to replace upgraded, luxury materials installed after original construction, such as stone, quartz, tile, or wood. For example, if an owner elects to install a removable base cabinet, Defendants shall ensure that the removable base cabinet is installed in a workmanlike manner and is "consistent" in appearance, as that term is defined above.  Additionally, if a cabinet is removed such that subfloor is exposed, Defendants shall install flooring in a workmanlike manner and "consistent" with the surrounding flooring, as that term is defined above.

35.    Defendants shall be responsible for obtaining all necessary building permits and any related inspections (including payment of all permit and/or

inspection fees).  For any retrofits for which a building permit or other prior

authorization from a State or local authority is required, Defendants shall apply for

or otherwise request such a permit or authorization within ninety (90) days.  These

timelines shall run from the date of entry of this Order, except with respect to

retrofits to units at Napilihau, Napili, and Wailea Fairway, in which case the

timeline shall run for each unit from the date on which the Neutral Inspector

approves the retrofits to that unit, as provided in Section IV, *infra*, subject to any

extension of time if necessary pursuant to Section XV, *infra*.

## IV.    NOTICE TO UNIT OWNERS AND RESIDENTS OF RETROFITS WITHIN UNITS

36.    With respect to retrofits occurring within individually-owned units at

Napilihau, Napili, and Wailea Fairway, individual unit owners will be provided the

opportunity to request the retrofits in writing under the procedures set forth below.

No retrofits will occur within an individually-owned unit absent a written request

from an individual unit owner as described herein.

37.    Within ten (10) days from the entry of this Order, Rule 19 Defendants

Napilihau Villages Association of Apartment Owners, Napili Villas HOA, Inc.,

and AOAO Wailea Fairway Villas will provide the last-known names, addresses,

and email addresses (if known) of unit owners at Napilihau, Napili, and Wailea

Fairway, respectively, to those Defendants responsible for the covered unit retrofits

at these respective properties as provided under Section III, *supra*, with a copy to the United States.  All contact information provided under this paragraph shall be and hereby is designated by the Parties as confidential under the Protective Order entered in this case.

38.    Within ten (10) days from the entry of this Order, Rule 19 Defendants Kahului Town Terrace LP and Palehua Apartments LP will provide the names, addresses, and email addresses (if known) of the residents at Kahului and Palehua Terrace to those Defendants responsible for the covered unit retrofits at these properties as provided under Section III, *supra*, with a copy to the United States.

39.    Within thirty (30) days from the entry of this Order, Defendants responsible for the covered unit retrofits at Napilihau, Napili, and Wailea Fairway as described above will mail and/or email the notice contained at Appendix F, and which is incorporated herein by reference, to the unit owners at these properties, using all pieces of contact information provided by the Rule 19 Defendants.

40.    The notice contained in Appendix F shall also enclose an "Accessibility Retrofits Selection Form," which is contained at Appendix G and incorporated herein by reference.  The notice in Appendix G shall provide a self-addressed, stamped return envelope, along with an email address and fax number. Defendants will only be obligated to perform retrofits on a given unit if the

retrofits are requested within three months of the unit owner's receipt of the notice contained at Appendix F.  For purposes of this paragraph, this notice shall be presumed to have been received by the owner three business days following the mailing of this notice.

      41.    The Neutral Inspector retained under Section VI, *infra*, shall schedule with the unit owner a short inspection of the unit to determine whether the accessibility barriers the unit owners seek to retrofit exist within the unit and were not caused by post-construction renovations.  The inspections will take place within three months after the receipt of the notice contained at Appendix F or as soon as the Neutral Inspector's and owners' schedules permit.  For purposes of this paragraph, this notice shall be presumed to have been received by the owner three business days following the mailing of this notice.  The Neutral Inspector shall notify the relevant Defendants and counsel for the United States of these inspections.  Defendants' representatives may attend these inspections in order to take measurements, photographs and video to assist in the permit application and construction planning processes.  Defendants may also separately schedule meetings with unit owners for this purpose.  Where the Neutral Inspector discovers clear evidence that an accessibility barrier does not exist or was caused by post-construction renovations or other material change in condition: (1) he or she shall

describe the basis and evidence for this determination in writing to counsel for the

Parties within five business days of the inspection, and (2) Defendants shall not be

required to retrofit that accessibility barrier.

42.    As soon as reasonably possible, but in any event no later than one

hundred eighty (180) days from the expiration of the three-month period described

in paragraph 40, above, Defendants must complete the retrofits to the unit subject

to any extension of time if necessary pursuant to Section XV, *infra*.  For purposes

of this paragraph, grounds for extending the 180-day deadline under Section XV

shall include (1) where the retrofits cannot be completed due solely to scheduling

conflicts raised by the unit owner, and (2) where materials necessary for the

completion of the retrofits have been timely ordered and cannot, through no action

or fault of Defendants, be delivered in time to complete the retrofits within 180

days.  The 180-day period shall exclude any time during which an application for a

necessary permit or prior authorization from the relevant local authority is pending.

In any event, all retrofits to units must be completed within thirty-six (36) months

of the entry of this Order.

43.    Within thirty (30) days from the entry of this Order, Defendants will

provide the notice contained in Appendix H and incorporated herein to the tenants

and residents at Kahului and Palehua Terrace.

## V.    INCONVENIENCE AND OVERNIGHT STAYS FOR RETROFITTING UNIT INTERIORS AT SUBJECT PROPERTIES

44.    In the event that an owner or resident of a unit scheduled to undergo a retrofit vacates the unit during the performance of the retrofit work – by election of the owner or resident, or by direction of the Defendants' representative – for undue inconvenience or hardship, the Defendants responsible for unit retrofits at the Subject Property at which the owner or resident lives (as provided in Section III, *supra*) will pay the unit owner or resident the applicable government per diem rate for food and lodging for the local area (as available at www.travel.dod.mil) for each day of undue inconvenience or hardship for all resident(s) of the unit.  For purposes of this section, "undue inconvenience or hardship" includes, but is not limited to, excessive dust, noise, worksite safety, disruption or interference with the owner's or resident's day-to-day activities or affairs, or significant disruption or interference with the Defendants' representative's retrofit work for a period of twenty-four (24) consecutive hours or more.  Such payment will be made prior to the commencement of any retrofit work on the unit, so that the unit owner or resident can use the money to obtain alternative living accommodations and food while dislocated.  Owners and residents may be notified that they may have to move personal items to allow for the work to be completed.

## VI.    NEUTRAL INSPECTOR OF THE RETROFITS

45.    Defendants will enter into a contract with one or more neutral inspector(s) approved by the United States ("Neutral Inspector"), which approval shall not be unreasonably withheld, to conduct pre-retrofit inspections of units as described in Section IV, *supra*, as well as on-site inspections of the retrofits that have been performed under this Order to determine whether the retrofits have been completed in accord with the specifications in this Order and the relevant Appendices.  The Neutral Inspector shall be a third party, not affiliated with any of the Defendants or this litigation, and shall have expertise in the Accessible Design Requirements of the FHA, the requirements of the FHA Guidelines, and ANSI A117.1-1986.

46.    With regard to Napilihau, Napili, and Wailea Fairway, an inspection of each Subject Property will take place within thirty (30) days of the completion of all the retrofits to the public and common use areas as set forth in the relevant Appendices, and within thirty (30) days of completion of all the retrofits to the covered units as set forth in the relevant Appendices.  With regard to Palehua Terrace and Kahului, an inspection of each Subject Property will take place within thirty (30) days of the completion of all retrofits at the Subject Property, including retrofits to units and public and common use areas.  Defendants will give the

24

United States and the Rule 19 Defendants at least three (3) weeks' notice of each

inspection and will give the United States an opportunity to have its

representative(s) present for the inspection.

47.     The inspections will be conducted by the Neutral Inspector in

accordance with this Order and the relevant Appendices.

48.     The Neutral Inspector will set out the results of each inspection of the

Subject Property, including deficits if any, in writing and will send that report to

counsel for the Parties.[3]  The Neutral Inspector will take digital photographs of any

deficiencies identified at each Subject Property.  If the inspection indicates that not

all the required retrofits have been made as specified in the Appendices that apply

to the Subject Property, Defendants will correct any deficiencies within ninety (90)

days of the Neutral Inspector's report subject to any extension as provided in

Section XV, *infra*, and will pay for another inspection by the same Inspector to

---

[3]  All documents, notices, communications, and other written materials
required by this Order shall be sent to the United States via email, addressed as
follows:  Max.Lapertosa@usdoj.gov and Nathan.Shulock@usdoj.gov.  Materials
may also be submitted by overnight delivery addressed as follows:

> Chief, Housing and Civil Enforcement Section
> Civil Rights Division
> United States Department of Justice
> 4 Constitution Square
> 150 M St. NE
> Washington, DC 20002
> Attn: DJ #175-21-29

certify the deficiencies have been corrected.  This process will continue until the

Neutral Inspector certifies that all the necessary retrofits have been made.

Defendants will pay all of the Neutral Inspector's reasonable costs associated with

these inspections of the Subject Property, as well as the pre-retrofit inspections of

covered units, and these payments will be made without regard to the Inspector's

findings.  Upon reasonable notice to Defendants and Rule 19 Defendants,

representatives of the United States will be permitted to inspect the retrofits made

by Defendants in accordance with this Order, to ensure compliance; provided,

however, that the United States will endeavor to minimize any inconvenience

caused by such inspections.

## VII.   NAPILI ACCESSIBILITY FUND

49.    The United States and Defendants agree that, due to the unique and

unusual existing circumstances with respect to certain covered units at Napili, an

accessible route cannot reasonably or feasibly be constructed to the following

covered units at Napili:  3 Kiohuohu Lane, Units 1 and 2; 9 Kiohuohu Lane, Units

1, 2, 3, and 4; 15 Kiohuohu Lane, Units 1, 2, 3, and 4; 28 Punohu Lane, Units 1, 2,

3, and 4; 32 Punohu Lane, Units 1, 2, 3, and 4; 38 Punohu Lane, Units 1, 2, 3, and

4; 130 Punohu Lane, Units 1 and 2; and 133 Punohu Lane, Unit 4.  For these units,

Defendants Albert C. Kobayashi, Inc., Design Partners, Inc., Michael N. Goshi,

Fukumoto Engineering, Inc., and Rojac Construction Inc. shall, within thirty (30)

days of the effective date of the Order, deposit a total sum of TWO HUNDRED

THOUSAND DOLLARS ($200,000) in a separate, interest-bearing account (the

"Napili Accessibility Fund" or "Fund"), in the name of and to be administered by

Rule 19 Defendant Napili Villas HOA, Inc.  The Fund shall be used to reimburse

owners for accessibility-related improvements at Napili that are in addition to the

retrofits that the relevant Defendants are obligated to make under this Order.

Nothing herein shall mean that the above-referenced units are not eligible for the

accessibility retrofits required to be made by the relevant Defendants to covered

units as provided in this Order and set forth in Appendix B.2.

50.    Within sixty (60) days of the effective date of this Order, Defendants

shall mail to all unit owners at Napili the notice contained at Appendix I and

incorporated herein by reference, which explains that unit owners may be eligible

to receive reimbursement from the Napili Accessibility Fund for accessibility-

related improvements within their units.

51.    Unit owners shall have eighteen (18) months from receipt of this

notice to request reimbursement from the Fund of costs related to or arising out of

accessibility-related improvements within their Unit.  No owner shall be

reimbursed from the Napili Accessibility Fund until the owner (1) receives

approval, in writing, from Napili Villas HOA, Inc., authorizing the accessibility-related improvement; and (2) submits documentation, to the satisfaction of Napili Villas HOA, Inc., establishing that the accessibility-related work was performed and has been completed (e.g., contracts, invoices, or receipts).

52.    Napili Villas HOA, Inc. shall process requests for reimbursement from unit owners on a first-come, first-served basis until the Napili Accessibility Fund is exhausted or eighteen (18) months from the establishment of the Fund, whichever is earlier.  Napili Villas HOA, Inc. may set a reasonable limit on the maximum amount to be paid to any one unit, subject to the United States' approval.  This limit shall be listed in the notice sent to unit owners at Appendix I.

53.    Napili Villas HOA, Inc. may, at its discretion, utilize funds from the Napili Accessibility Fund to make accessibility-related improvements in the public and common use areas of Napili that are in addition to those being provided under this Order.  Nothing herein shall require Napili Villas HOA, Inc. to retrofit or repair any public or common use area that is excluded from the scope of retrofits required to be made by Defendants under Paragraph 49 of this Order, the same having been agreed to by Defendants and the United States as being not reasonable or feasible.

54.    Napili Villas HOA, Inc. may allocate fifteen percent (15%) of the total amount of the Fund towards costs related to or arising out of the establishment, administration and maintenance of the Fund.

55.    Napili Villas HOA, Inc. shall send to the United States within thirty (30) days of its receipt, copies of any requests for reimbursement for accessibility-related improvements, along with receipts, invoices, or other documentation indicating the accessibility-related work that was performed.  During the term of the Fund, the United States may, upon reasonable notice, request and inspect copies of any documents concerning the Fund.

56.    After the expiration of the period under which owners may request reimbursement for retrofits contained in paragraph 51, above, any remaining funds will revert to Napili Villas HOA, Inc. and the conditions set forth in this Section shall terminate.  Notwithstanding the foregoing, Napili Villas HOA, Inc., shall use any remaining funds for improvements, services, or other expenditures that provide, expand, or enhance the use and enjoyment of Napili for persons with disabilities.  During the term of this Order, the United States may, upon reasonable notice, request and inspect copies of any documents concerning these funds.

29

## VIII.  TRANSFER OF INTEREST IN SUBJECT PROPERTIES

57.    The sale, foreclosure, or any other transfer of ownership, in whole or in part, whether voluntary or involuntary, of any of the Subject Properties shall not affect Defendants' continuing obligation to retrofit any Subject Property as specified in this Order.  Prior to the completion of the sale or transfer of Palehua Terrace or Kahului, the relevant Rule 19 Defendant(s) shall: (a) provide to each prospective buyer or transferee written notice that the Subject Property is subject to this Order, along with a copy of this Order; and (b) provide to the United States a copy of the notice sent to each buyer or transferee, and each buyer's or transferee's name and address.

## IX.    NON-DISCRIMINATION IN FUTURE DESIGN AND CONSTRUCTION

58.    During the term of this Order, Defendants will maintain, and provide to the United States, the following information and statements regarding multifamily dwellings under construction and any other covered multifamily dwellings in Hawaii intended to be, or which actually are, developed, built, designed, constructed, or engineered in whole or in part, by Defendants or by any entities in which they have a position of control as an officer, director, member, or manager, or have a ten-percent (10%) or larger ownership share:

    a.    The name and address of the property, and a description of the property and the individual units; and

b.    Copies of any publicly filed building, architectural, engineering, or as-built plans in Defendants' possession.

## X.    DAMAGES FOR AGGRIEVED PERSONS

59.    Defendants Albert C. Kobayashi, Inc., Martin V. Cooper, Warren S. Unemori, Inc., Goodfellow Bros. LLC, Design Partners, Inc., Michael N. Goshi, Stanford Carr Development, LLC, SCD Wailea Fairways, LLC, and Sato & Associates shall pay a total sum of ONE HUNDRED TWENTY THOUSAND DOLLARS ($120,000) to the individuals identified by the United States as aggrieved persons, as set forth in Appendix J.  Within thirty (30) days of the entry of this Order, the Defendants identified in this paragraph shall send to the United States checks payable to those individuals in the amounts listed in Appendix J, via overnight delivery.

60.    The United States will retain in its possession the check for each aggrieved person named in Appendix J until that person or their authorized representative has executed a written release of all claims, legal or equitable, in the form of Appendix K that he or she might have against any and all Defendant(s) and Rule 19 Defendants relating to the claims asserted in the lawsuit, whether in their individual capacity or in their capacity as the parent, guardian, next friend, or

representative of another individual or estate, as applicable.  The United States

shall deliver the signed releases to counsel for Defendants and Rule 19 Defendants.

61.    With respect to the damages award to the estate of Rudy Sanchez, the

parties stipulate and agree that this award is intended to compensate solely for the

emotional distress experienced by Rudy Sanchez as a result of the inaccessibility

of his individual unit at Napilihau Villages, and not to any common area violations

at that or any other property.  Accordingly, the parties agree that this award does

not duplicate, and therefore shall not be offset by, any settlement award in *Sanchez*

*v. Association of Apartment Owners of Napilihau Villages et al.*, 14-1-0562 (Haw.

Cir. Ct. 2d Cir.).

62.    The Court approves the monetary damages award to Stephen Galarza

as listed in Appendix J and authorizes the payment of such award to be made on

his behalf to Beverly Galarza, his mother and legal guardian.  Ms. Galarza shall

have the authority of a "next friend" to execute and sign the release of claims

contained in Appendix K on behalf of Stephen Galarza.

## XI.    EDUCATIONAL PROGRAM

63.    Within thirty (30) days from the entry of this Order, Defendants will

provide a copy of this Order to employees and agents who have managing

authority over the design and/or construction of covered multifamily dwellings in

Hawaii, as well as any current employees who were involved in the design or construction of the Subject Properties, and secure the signed statement from each such agent or employee acknowledging that he or she has received and read the Order, and has had an opportunity to have questions about the Order answered. This statement is contained in Appendix L and incorporated herein by reference.

64.    Defendants will also ensure that they and their employees and agents who have managing authority over the design and/or construction of covered multifamily dwellings in Hawaii have a copy of, are familiar with, and personally review, the Accessible Design Requirements of the FHA, the FHA Guidelines, and the United States Department of Housing and Urban Development, *Fair Housing Act Design Manual, A Manual to Assist Builders in Meeting the Accessibility Requirements of the Fair Housing Act* (August 1996, Rev. April 1998).

65.    Within one hundred twenty (120) days from the entry of this Order, Defendants and their employees and agents who have managing authority over the design and/or construction of covered multifamily dwellings in Hawaii will undergo training on the accessibility requirements of the FHA.  The training will be conducted by a qualified individual, unconnected to Defendants or Defendants' attorneys or this litigation, and approved by the United States at least fifteen (15) days in advance of the training.  The training shall be live (i.e., conducted in real

time by the qualified individual) but may be conducted by remote means. Any

expenses associated with this training will be borne by Defendants. Defendants

will provide to the United States, within thirty (30) days after the training, the

name(s), address(es) and telephone number(s) of the trainer(s); copies of the

training outlines and any materials distributed by the trainers; and certifications

executed by all Defendants and covered employees and agents confirming their

attendance, in the form contained in Appendix M and incorporated herein by

reference.

## XII.  NOTICE OF DEFENDANTS' NON-DISCRIMINATION POLICY

66.    Defendants represent that they do not conduct advertising of the sale

or rental of covered multifamily dwellings. Should any Defendant conduct any

such advertising during the term of this Order, including in newspapers, electronic

media, pamphlets, brochures and other promotional literature, such Defendant will

place, in a conspicuous location, a statement that the covered units include features

for persons with disabilities required by the FHA.

## XIII.  NOTIFICATION AND DOCUMENT RETENTION REQUIREMENTS

67.    In addition to all other reporting required herein, within one hundred

eighty (180) days from the entry of this Order, each Defendant will submit to the

United States an initial report containing the reporting required by Sections IX and

XI and containing the signed statements of such Defendant and their employees

and agents who have completed the training program specified in under Section XI

of this Order.

68.    Defendants will, on a quarterly basis, submit to the United States a

compliance report detailing the retrofitting and inspections of the retrofits at the

Subject Properties.

69.    For the duration of this Order, Defendants will advise the United

States in writing within fifteen (15) days of receipt of any written administrative or

legal fair housing complaint against any property designed and/or constructed by

them alleging non-compliance with the Accessible Design Requirements of the

FHA.  Upon reasonable notice, Defendants will also provide the United States all

information it may request concerning any such complaint.  Defendants will also

advise the United States, in writing, within fifteen (15) days of the resolution of

any complaint.

70.    For the term of this Order, Defendants are required to preserve all

records related to this Order, to the Subject Properties, and to any other

multifamily dwellings designed, constructed, owned, or operated by them.  Upon

reasonable notice to Defendants, the United States will be permitted to inspect and

copy any records of Defendants or inspect any properties or units under the control of Defendants bearing on compliance with this Order.

71.     Any Defendant who represents to the United States in writing and under oath pursuant to 28 U.S.C. § 1746 that they are no longer engaged in, or retired from, the practice of building and/or designing "covered multifamily dwellings" as defined by the FHA need not comply with the provisions of Sections XI, XII, and XIII, above.

## XIV.  DURATION OF CONSENT ORDER AND TERMINATION OF LEGAL ACTION

72.     This Order will remain in effect for eight (8) years from its entry.  The Court will retain jurisdiction for the duration of this Order to enforce the terms of the Order, at which time the case will be dismissed with prejudice.  The United States may move the Court to extend the duration of the Order in the interests of justice.

73.     No earlier than three years after entry of this Order, any Defendant may move the Court for early termination of the Order as to that Defendant only, provided that the Neutral Inspector has certified that all of the retrofits required by the relevant Appendices have been completed as to the Subject Property(ies) for which the moving Defendant is responsible under Section III of this Order and the moving Defendant is not in breach of any other term of this Order.

36

74.     No earlier than three years after entry of this Order, any Rule 19
Defendant may move the Court for early termination of the Order as to that Rule
19 Defendant only, provided that the Neutral Inspector has certified that all of the
retrofits required by the relevant Appendices have been completed as to that Rule
19 Defendant's Subject Property, and the Rule 19 Defendant is not in breach of
any other term of this Order.

75.     All Parties will endeavor, in good faith, to resolve informally any
differences regarding interpretation of and compliance with this Order prior to
bringing such matters to the Court for resolution.  The Parties may also request the
involvement of the Honorable Barry M. Kurren, United States Magistrate Judge, to
resolve any disputes arising under this Order.  However, in the event of a failure by
a Defendant to perform, in a timely manner, any act required by this Order or to act
in conformance with any provision thereof, the United States may move this Court
to impose any remedy authorized by law or equity, including, but not limited to, an
order requiring performance of such act or deeming such act to have been
performed, and an award of any damages, costs, and reasonable attorney's fees
which may have been occasioned by the violation or failure to perform.

76.     Notwithstanding the provisions of Paragraph 75, above, in any
dispute arising out of the provisions of Paragraph 34, the Parties shall submit such

disputes to the Neutral Inspector.  Any party dissatisfied with the Neutral

Inspector's determination may seek review for final determination by the

Honorable Barry M. Kurren, United States Magistrate Judge.

## XV.   TIME FOR PERFORMANCE

77.    Any time limits for performance imposed by this Order may be

extended by the mutual written agreement of the United States and the relevant

Defendants.

78.    The parties recognize that, due to the wildfires that occurred on Maui

in August 2023, thousands of homes and other structures in Lahaina and elsewhere

on Maui were damaged or destroyed and will need to be rebuilt or repaired over

the next several years.  The parties further recognize that these reconstruction

efforts may impact the time it takes to obtain building permits, workers, and

building materials necessary to complete the retrofits specified in this Order.

Accordingly, the parties agree that any delays resulting from the reconstruction of

buildings damaged by these fires shall constitute grounds for extending any

deadlines in this Order.  The United States may move to extend the term of this

Order as stated in Paragraph 72, *supra*, if such an extension is necessitated by any

extensions agreed to under this Paragraph.

38

## XVI.  RELEASE OF LITIGATION HOLDS

79.    The Parties agree that, as of the date of entry of this Order, litigation is
not "reasonably foreseeable" concerning the subject matter of the United States'
complaint.  To the extent that any of the Parties previously implemented a
litigation hold to preserve documents, electronically stored information, or things
related to the matters described herein, the party is no longer required to maintain
such a litigation hold.  Nothing in this paragraph relieves the Parties of any other
obligation imposed by this Order.


SO ORDERED THIS ___27th___ DAY OF _____October_____, 2023



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

By their signatures below, the Parties consent to the entry of this Consent

Order.

For Plaintiff United States of America:

CLARE E. CONNORS
United States Attorney
District of Hawaii

SYDNEY SPECTOR
Assistant U.S. Attorney
300 Ala Moana Blvd.
Honolulu, HI 96850
(808) 541-2850
Sydney.Spector@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CARRIE PAGNUCCO
Chief, Housing and Civil
Enforcement Section
MICHAEL S. MAURER
Deputy Chief
MAX LAPERTOSA
NATHAN SHULOCK
Trial Attorneys
950 Pennsylvania Ave N.W. – 4CON
Washington, D.C. 20530
(202) 598-9726
Max.Lapertosa@usdoj.gov
Nathan.Shulock@usdoj.gov

For Defendant Albert C. Kobayashi, Inc.:

_____
ANNA M. ELENTO-SNEED
SAMANTHA SNEED
TRISHA GIBO
ES&A, Inc.
1003 Bishop St., Suite 2750
Honolulu, HI 96813
(808) 729-9400
aes@esandalaw.com

MILES B. FURUTANI
700 Bishop St., Suite 1700
Honolulu, HI 96813
(808) 528-1000
mfurutani@hawaii.rr.com

_____
MICHAEL Y. YOUNG

For Defendants Martin V. Cooper, Sato & Associates, and Ronald M. Fukumoto Engineering, Inc.:

_____
FRANK K. GOTO, JR.
JANE KWAN
DANA MORITA
Law Offices of Frank Goto Jr.
888 Mililani St., Suite 300
Honolulu, HI 96813
(808) 531-4686
fgoto@frankgotolaw.com

_____
MARTIN V. COOPER

_____
[Sato & Associates Representative]

_____
RONALD M. FUKUMOTO

For Defendant Albert C. Kobayashi, Inc.:

For Defendants Martin V. Cooper, Sato & Associates, and Ronald M. Fukumoto Engineering, Inc.:

---

ANNA M. ELENTO-SNEED
SAMANTHA SNEED
TRISHA GIBO
ES&A, Inc.
1003 Bishop St., Suite 2750
Honolulu, HI 96813
(808) 729-9400
aes@esandalaw.com

MILES B. FURUTANI
700 Bishop St., Suite 1700
Honolulu, HI 96813
(808) 528-1000
mfurutani@hawaii.rr.com

---

FRANK K. GOTO, JR.
JANE KWAN
DANA E. MORITA
Law Offices of Frank Goto Jr.
888 Mililani St., Suite 300
Honolulu, HI 96813
(808) 531-4686
fgoto@frankgotolaw.com

---

MARTIN V. COOPER

---

[ACK Representative]

---

RICHARD M. SATO

---

RONALD M. FUKUMOTO

For Defendant Albert C. Kobayashi, Inc.:

For Defendants Martin V. Cooper, Sato & Associates, and Ronald M. Fukumoto Engineering, Inc.:

ANNA M. ELENTO-SNEED
SAMANTHA SNEED
TRISHA GIBO
ES&A, Inc.
1003 Bishop St., Suite 2750
Honolulu, HI 96813
(808) 729-9400
aes@esandalaw.com

FRANK K. GOTO, JR.
JANE KWAN
DANA E. MORITA
Law Offices of Frank Goto Jr.
888 Mililani St., Suite 300
Honolulu, HI 96813
(808) 531-4686
fgoto@frankgotolaw.com

MILES B. FURUTANI
700 Bishop St., Suite 1700
Honolulu, HI 96813
(808) 528-1000
mfurutani@hawaii.rr.com

MARTIN V. COOPER

RICHARD M. SATO

[ACK Representative]

RONALD M. FUKUMOTO

For Defendant Albert C. Kobayashi,
Inc.:

For Defendants Martin V. Cooper, Sato
& Associates, and Ronald M.
Fukumoto Engineering, Inc.:

_____

ANNA M. ELENTO-SNEED
SAMANTHA SNEED
TRISHA GIBO
ES&A, Inc.
1003 Bishop St., Suite 2750
Honolulu, HI 96813
(808) 729-9400
aes@esandalaw.com

_____

FRANK K. GOTO, JR.
JANE KWAN
DANA E. MORITA
Law Offices of Frank Goto Jr.
888 Mililani St., Suite 300
Honolulu, HI 96813
(808) 531-4686
fgoto@frankgotolaw.com

MILES B. FURUTANI
700 Bishop St., Suite 1700
Honolulu, HI 96813
(808) 528-1000
mfurutani@hawaii.rr.com

_____

MARTIN V. COOPER

_____

[ACK Representative]

_____

RICHARD M. SATO

_____

RONALD M. FUKUMOTO

41

For Defendants Design Partners, Inc.
and Michael N. Goshi:


_____
ARTHUR H. KUWAHARA
Kim & Kuwahara
345 Queen St., Suite 915
Honolulu, HI 96813
(808) 536-4421 ext. 115
ahk@lkwyl.com


_____
MICHAEL N. GOSHI


For Defendants Stanford Carr
Development, LLC and SCD Wailea
Fairways, LLC:


_____
WILLIAM MEHEULA
Meheula Law, LLLC
500 Ala Moana Blvd., Suite 499
Honolulu, HI 96813
(808) 628-7535
bill@meheulalaw.com


_____
[Stanford Carr/SCD representative]


For Defendants Fritz Johnson, Inc., and
Frederick M. Johnson:


_____
LEROY E. COLOMBE
JASON W. JUTZ
Chun Kerr LLP
999 Bishop St., Suite 2100
Honolulu, HI 96813
(808) 528-8200
lcolombe@chunkerr.com


_____
FREDERICK M. JOHNSON


For Defendant Rojac Construction,
Inc.:


_____
ANNA H. OSHIRO
DAVID H. ABITBOL
NICHOLAS KOUKALA ERNST
Damon Key Leong Kupchak Hastert
1003 Bishop St., Suite 1600
Honolulu, HI 96813


_____
[Rojac representative]

For Defendants Design Partners, Inc.
and Michael N. Goshi:

For Defendants Fritz Johnson, Inc., and
Frederick M. Johnson:

_____
ARTHUR H. KUWAHARA
Kim & Kuwahara
345 Queen St., Suite 915
Honolulu, HI 96813
(808) 536-4421 ext. 115
ahk@lkwyl.com

_____
LEROY E. COLOMBE
JASON W. JUTZ
Chun Kerr LLP
999 Bishop St., Suite 2100
Honolulu, HI 96813
(808) 528-8200
lcolombe@chunkerr.com

_____
MICHAEL N. GOSHI

_____
FREDERICK M. JOHNSON

For Defendants Stanford Carr
Development, LLC and SCD Wailea
Fairways, LLC:

For Defendant Rojac Construction,
Inc.:

_____
WILLIAM MEHEULA
Meheula Law, LLLC
500 Ala Moana Blvd., Suite 499
Honolulu, HI 96813
(808) 628-7535
bill@meheulalaw.com

_____
ANNA H. OSHIRO
DAVID H. ABITBOL
NICHOLAS KOUKALA ERNST
Damon Key Leong Kupchak Hastert
1003 Bishop St., Suite 1600
Honolulu, HI 96813

_____
[Stanford Carr Development, LLC and
SCD Wailea Fairways, LLC
representative]

_____
[Rojac representative]

42

For Defendants Design Partners, Inc.
and Michael N. Goshi:

ARTHUR H. KUWAHARA
Kim & Kuwahara
345 Queen St., Suite 915
Honolulu, HI 96813
(808) 536-4421 ext. 115
ahk@lkwyl.com

MICHAEL N. GOSHI

For Defendants Stanford Carr
Development, LLC and SCD Wailea
Fairways, LLC:

WILLIAM MEHEULA
Meheula Law, LLLC
500 Ala Moana Blvd., Suite 499
Honolulu, HI 96813
(808) 628-7535
bill@meheulalaw.com

[Stanford Carr/SCD representative]

For Defendants Fritz Johnson, Inc., and
Frederick M. Johnson:

LEROY E. COLOMBE
JASON W. JUTZ
Chun Kerr LLP
999 Bishop St., Suite 2100
Honolulu, HI 96813
(808) 528-8200
lcolombe@chunkerr.com

FREDERICK M. JOHNSON

For Defendant Rojac Construction,
Inc.:

ANNA H. OSHIRO
DAVID H. ABITBOL
NICHOLAS KOUKALA ERNST
Damon Key Leong Kupchak Hastert
1003 Bishop St., Suite 1600
Honolulu, HI 96813

[Rojac representative]

For Defendants Design Partners, Inc. and Michael N. Goshi:

For Defendants Fritz Johnson, Inc., and Frederick M. Johnson:

_____

ARTHUR H. KUWAHARA
Kim & Kuwahara
345 Queen St., Suite 915
Honolulu, HI 96813
(808) 536-4421 ext. 115
ahk@lkwyl.com

_____

LEROY E. COLOMBE
JASON W. JUTZ
Chun Kerr LLP
999 Bishop St., Suite 2100
Honolulu, HI 96813
(808) 528-8200
lcolombe@chunkerr.com

_____

MICHAEL N. GOSHI

_____

FREDERICK M. JOHNSON

For Defendants Stanford Carr Development, LLC and SCD Wailea Fairways, LLC:

For Defendant Rojac Construction, Inc.:

_____

WILLIAM MEHEULA
Meheula Law, LLLC
500 Ala Moana Blvd., Suite 499
Honolulu, HI 96813
(808) 628-7535
bill@meheulalaw.com

_____

ANNA H. OSHIRO
DAVID H. ABITBOL
NICHOLAS KOUKALA ERNST
Damon Key Leong Kupchak Hastert
1003 Bishop St., Suite 1600
Honolulu, HI 96813

_____

[Stanford Carr/SCD representative]

_____

[Rojac representative]

42

For Defendant Delta Construction
Corp.:

_____
DAVID A. NAKASHIMA
Nakashima Ching LLC
737 Bishop St., Suite 2090
Honolulu, HI 96813
(808) 784-2090
dan@nchilaw.com

_____
Kenneth J. Kobatake, President
Delta Construction Corporation

For Defendant Goodfellow Bros. LLC:

_____
RICHARD M. RAND
ANDREA LUX MIYASHITA
Marr Jones & Wang LLP
1003 Bishop St., Suite 1500
Honolulu, HI 96813
(808) 536-4900
rrand@marrjones.com

_____
[Goodfellow representative]

For Defendants Warren S. Unemori
Engineering, Inc. and GYA Architects,
Inc.:

_____
BENNETT J. CHIN
SABRINA M. KAWANA
Gordon Rees Scully Mansukhani, LLP
707 Richards St., Suite 625
Honolulu, HI 96813
(808) 441-1830
bchin@grsm.com

_____
[WARREN S. UNEMORI Engineer,
Inc. representative]

_____
[GYA Architects representative]

43

For Defendant Delta Construction
Corp.:

For Defendants Warren S. Unemori
Engineering, Inc. and GYA Architects,
Inc.:

_____

DAVID A. NAKASHIMA
Nakashima Ching LLC
737 Bishop St., Suite 2090
Honolulu, HI 96813
(808) 784-2090
dan@nchilaw.com

_____

BENNETT J. CHIN
SABRINA M. KAWANA
Gordon Rees Scully Mansukhani, LLP
707 Richards St., Suite 625
Honolulu, HI 96813
(808) 441-1830
bchin@grsm.com

_____

[Delta representative]

_____

[WARREN S. UNEMORI Engineer,
Inc. representative]

_____

[GYA Architects representative]

For Defendant Goodfellow Bros. LLC:

_____

RICHARD M. RAND
ANDREA LUX MIYASHITA
Marr Jones & Wang LLP
1003 Bishop St., Suite 1500
Honolulu, HI 96813
(808) 536-4900
rrand@marrjones.com

_____

[Goodfellow representative]
Its General Counsel

43

For Defendant Delta Construction
Corp.:

For Defendants Warren S. Unemori
Engineering, Inc. and GYA Architects,
Inc.:

_____
DAVID A. NAKASHIMA
Nakashima Ching LLC
737 Bishop St., Suite 2090
Honolulu, HI 96813
(808) 784-2090
dan@nchilaw.com

_____
BENNETT J. CHIN
SABRINA M. KAWANA
Gordon Rees Scully Mansukhani, LLP
707 Richards St., Suite 625
Honolulu, HI 96813
(808) 441-1830
bchin@grsm.com

_____
[Delta representative]

_____
REED M. ARIYOSHI
Warren S. Unemori Engineering, Inc.

_____
ALVIN M. YOSHIMORI
GYA Architects

For Defendant Goodfellow Bros. LLC:

_____
RICHARD M. RAND
ANDREA LUX MIYASHITA
Marr Jones & Wang LLP
1003 Bishop St., Suite 1500
Honolulu, HI 96813
(808) 536-4900
rrand@marrjones.com

_____
[Goodfellow representative]

43

For Defendant Delta Construction
Corp.:

For Defendants Warren S. Unemori
Engineering, Inc. and GYA Architects,
Inc.:

_____

DAVID A. NAKASHIMA
Nakashima Ching LLC
737 Bishop St., Suite 2090
Honolulu, HI 96813
(808) 784-2090
dan@nchilaw.com

_____

BENNETT J. CHIN
SABRINA M. KAWANA
Gordon Rees Scully Mansukhani, LLP
707 Richards St., Suite 625
Honolulu, HI 96813
(808) 441-1830
bchin@grsm.com

_____

[Delta representative]

_____

REED M. ARIYOSHI
Warren S. Unemori Engineering, Inc.

_____

ALVIN M. YOSHIMORI
GYA Architects

For Defendant Goodfellow Bros. LLC:

_____

RICHARD M. RAND
ANDREA LUX MIYASHITA
Marr Jones & Wang LLP
1003 Bishop St., Suite 1500
Honolulu, HI 96813
(808) 536-4900
rrand@marrjones.com

_____

[Goodfellow representative]

43

For Defendant Delta Construction
Corp.:

For Defendants Warren S. Unemori
Engineering, Inc. and GYA Architects,
Inc.:

_____
DAVID A. NAKASHIMA
Nakashima Ching LLC
737 Bishop St., Suite 2090
Honolulu, HI 96813
(808) 784-2090
dan@nchilaw.com

_____
BENNETT J. CHIN
SABRINA M. KAWANA
Gordon Rees Scully Mansukhani, LLP
707 Richards St., Suite 625
Honolulu, HI 96813
(808) 441-1830
bchin@grsm.com

_____
[Delta representative]

_____
REED M. ARIYOSHI
Warren S. Unemori Engineering, Inc.

_____
ALVIN M. YOSHIMORI
GYA Architects

For Defendant Goodfellow Bros. LLC:

_____
RICHARD M. RAND
ANDREA LUX MIYASHITA
Marr Jones & Wang LLP
1003 Bishop St., Suite 1500
Honolulu, HI 96813
(808) 536-4900
rrand@marrjones.com

_____
[Goodfellow representative]

43

For Rule 19 Defendant Napilihau
Villages Association of Apartment
Owners:


_____
HARVEY MAXWELL K. KOPPER
JASON K. ADANIYA
Porter McGuire Kiakona LLP
841 Bishop St., Suite 1500
Honolulu, HI 96813
(808) 539-1100
mkopper@HawaiiLegal.com

Anastasia Cott  10/19/23  Treasurer

_____  10/17/2023
[Napilihau representative]
Kara Scott, BOD President

For Rule 19 Defendant AOAO Wailea
Fairway Villas:


_____
SHARON PARIS
MATTHEW C. SHANNON
Bays Rose Lung & Wagnild
700 Bishop St., Suite 900
Honolulu, HI 96813
(808) 523-9000
sparis@legalhawaii.com



_____
[AOAO Wailea Fairway
representative]

For Rule 19 Defendant Napili Villas
HOA, Inc.:


_____
REBECCA OATO FILIPOVIC
WILLIAM M. MCKEON
Berding & Weil, LLP
2145 Kaohu St., Suite 203
Wailuku, HI 96793
(808) 242-6644
rfilipovic@berdingweil.com


_____
[Napili representative]

For Rule 19 Defendant Kahului Town
Terrace LP:


_____
PAUL R. GRABLE
GEORGE W. BRANDT
Lyons Brandt Cook & Hiramatsu
841 Bishop St., Suite 1800
Honolulu, HI 96813
(808) 524-7030
pgrable@lbchlaw.com



_____
[Kahului representative]

44

For Rule 19 Defendant Napilihau
Villages Association of Apartment
Owners:

For Rule 19 Defendant Napili Villas
HOA, Inc.:

_____
HARVEY MAXWELL K. KOPPER
JASON K. ADANIYA
Porter McGuire Kiakona LLP
841 Bishop St., Suite 1500
Honolulu, HI 96813
(808) 539-1100
mkopper@HawaiiLegal.com

_____
REBECCA OATO FILIPOVIC
WILLIAM M. MCKEON
Berding & Weil, LLP
2145 Kaohu St., Suite 203
Wailuku, HI 96793
(808) 242-6644
rfilipovic@berdingweil.com

_____
[Napilihau representative]

_____
[Napili representative]

For Rule 19 Defendant AOAO Wailea
Fairway Villas:

For Rule 19 Defendant Kahului Town
Terrace LP:

_Sharon Paris_____
SHARON PARIS
MATTHEW C. SHANNON
Bays Rose Lung & Wagnild
700 Bishop St., Suite 900
Honolulu, HI 96813
(808) 523-9000
sparis@legalhawaii.com

_____
PAUL R. GRABLE
GEORGE W. BRANDT
Lyons Brandt Cook & Hiramatsu
841 Bishop St., Suite 1800
Honolulu, HI 96813
(808) 524-7030
pgrable@lbchlaw.com

_Mary Jurkonis_____, Board President

_____
[Kahului representative]

44

For Rule 19 Defendant Napilihau
Villages Association of Apartment
Owners:

HARVEY MAXWELL K. KOPPER
JASON K. ADANIYA
Porter McGuire Kiakona LLP
841 Bishop St., Suite 1500
Honolulu, HI 96813
(808) 539-1100
mkopper@HawaiiLegal.com

[Napilihau representative]

For Rule 19 Defendant Napili Villas
HOA, Inc.:

REBECCA OATO FILIPOVIC
WILLIAM M. MCKEON
Berding & Weil, LLP
2145 Kaohu St., Suite 203
Wailuku, HI 96793
(808) 242-6644
rfilipovic@berdingweil.com

[Napili representative]

For Rule 19 Defendant AOAO Wailea
Fairway Villas:

SHARON PARIS
MATTHEW C. SHANNON
Bays Rose Lung & Wagnild
700 Bishop St., Suite 900
Honolulu, HI 96813
(808) 523-9000
sparis@legalhawaii.com

[AOAO Wailea Fairway
representative]

For Rule 19 Defendant Kahului Town
Terrace LP:

PAUL R. GRABLE
GEORGE W. BRANDT
Lyons Brandt Cook & Hiramatsu
841 Bishop St., Suite 1800
Honolulu, HI 96813
(808) 524-7030
pgrable@lbchlaw.com

[Kahului representative]

CONFIDENTIAL—DRAFT—FOR SETTLEMENT PURPOSES ONLY
INADMISSIBLE UNDER FED. R. EVID. 408

For Rule 19 Defendant Napilihau
Villages Association of Apartment
Owners:

For Rule 19 Defendant Napili Villas
HOA, Inc.:

_____

HARVEY MAXWELL K. KOPPER
JASON K. ADANIYA
Porter McGuire Kiakona LLP
841 Bishop St., Suite 1500
Honolulu, HI 96813
(808) 539-1100
mkopper@HawaiiLegal.com

_____

REBECCA OATO FILIPOVIC
WILLIAM M. MCKEON
Berding & Weil, LLP
2145 Kaohu St., Suite 203
Wailuku, HI 96793
(808) 242-6644
rfilipovic@berdingweil.com

_____

[Napilihau representative]

_____

[Napili representative]

For Rule 19 Defendant AOAO Wailea
Fairway Villas:

For Rule 19 Defendant Kahului Town
Terrace LP:

_____

SHARON PARIS
MATTHEW C. SHANNON
Bays Rose Lung & Wagnild
700 Bishop St., Suite 900
Honolulu, HI 96813
(808) 523-9000
sparis@legalhawaii.com

_____

PAUL R. GRABLE
GEORGE W. BRANDT
Lyons Brandt Cook & Hiramatsu
841 Bishop St., Suite 1800
Honolulu, HI 96813
(808) 524-7030
pgrable@lbchlaw.com

_____

[AOAO Wailea Fairway
representative]

_____

[Kahului representative]
   Karen Seddon

For Rule 19 Defendant Palehua
Apartments LP:


_____
KURT K. LEONG
Ogawa, Lau, Nakamura, & Jew
600 Ocean View Center
707 Richards St.
Honolulu, HI 96813
(808) 533-3999
kleong@ollon.com


_____
[Palehua Apartments LP
representative]

45

# APPENDIX A.1
# PUBLIC AND COMMON USE RETROFITS AT NAPILIHAU

As set forth in the Consent Order and this Appendix, Defendants Albert C. Kobayashi, Inc., Martin V. Cooper, Warren S. Unemori, Inc., and Goodfellow Bros. LLC will make the following retrofits to the public and common use areas at Napilihau:

| Location | Violation | Retrofit |
|---|---|---|
| Building 1 | Connection from perimeter sidewalk to 1-102 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less or construct as compliant ramp with slope of 8.33% or less, and reduce cross slope to 2% or less on existing concrete walkway |
| Building 1 | Perimeter sidewalk between connection to 1-102 and connection to 1-101 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 1 | Connection from perimeter sidewalk to 1-104 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 1 | Perimeter sidewalk between connection to 1-104 and connection to 1-108 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 1 | Upper level of mailboxes higher than 54" above finished floor | Alter mailbox heights and/or location so that no mailbox exceeds 54" above finished floor |
| Building 1 | Curb ramp to mailboxes has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Buildings 1 and 3 | Lack of accessible route from certain covered units to public and common use areas | Add compliant, concrete sidewalk on northwest side of corner peninsula (near eastern corner of Building 1), connecting existing sidewalk to road; add compliant, concrete curb ramp at or near terminus of new sidewalk, in an exact location to be determined; add crosswalk from new curb ramp, across road, and then alongside peninsula (near western corner of Building 3), ending at trash dumpster and existing curb ramp next to dumpster |

| Location | Violation | Retrofit |
|---|---|---|
| Buildings 1 and 4 | Lack of accessible route to trash dumpster | Create two accessible parking spots in front of Building 4 (space numbers in original site plans to be determined); create access aisle to be shared by both accessible parking spaces; add curb ramp from sidewalk to access aisle; convert peninsula next to dumpster at Building 1 into concrete sidewalk; add curb ramp at end of new sidewalk; connect two new curb ramps with cross walk |
| Buildings 1 and 8 | Lack of accessible route from covered units to public and common use areas | Add concrete sidewalk lengthwise across grassy area at northeast corner of parking area east of Building 8 (the "foot" of the peninsula), with curb ramps at each end; add crosswalk connecting eastern curb ramp to curb ramp at mail boxes; and add cross walk connecting western curb ramp to access aisle in front of 8-102 |
| Building 2 | Perimeter sidewalk between connection to 2-103 and connection to 2-102 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 2 | Connection from perimeter sidewalk to 2-102 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 2 | Perimeter sidewalk between connection to 2-102 and corner (not including extension of sidewalk to curb ramp) has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 2 | Perimeter sidewalk between corner and connection to 2-101 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 2 | Perimeter sidewalk between corner and connection to 2-101 has abrupt level change | Grind or otherwise create bevel no steeper than 1:2 |
| Building 2 | Perimeter sidewalk between corner and curb ramp has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |

2

| Location | Violation | Retrofit |
|---|---|---|
| Building 2 | Curb ramp has running slope that exceeds 8.33% and cross slope that exceeds 2% | Reduce running slope to 8.33% or less, and reduce cross slope to 2% or less on existing concrete walkway |
| Building 3 | Connection from perimeter sidewalk to 3-102 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less or construct as compliant ramp with slope of 8.33% or less, and reduce cross slope to 2% or less on existing concrete walkway |
| Building 3 | Perimeter sidewalk between connection to 3-102 and curb ramp at corner has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 3 | Connection from perimeter sidewalk to 3-101 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 4 | Perimeter sidewalk between corner near curb ramp and connection to 4-101 and 4-102 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 4 | Route to units 4-101 and 4-102 has four steps | Create accessible route by constructing concrete sidewalk from parking area at northeast corner of Building 4 alongside east side of Building 4 (between Building 4 and Napilihau Street), connecting with existing walkway to 4-101 and 4-102 |
| Buildings 4 and 5 | Connection to 4-101, 4-102, 5-103, and 5-104, between perimeter sidewalk and steps, has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 5 | Connection from perimeter sidewalk to 5-102 has gap | Fill gap |
| Building 5 | Perimeter sidewalk between connection to 5-102 and connection to 5-101 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 5 | Perimeter sidewalk between connection to 5-101 and corner near bicycle rack has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 5 | Perimeter sidewalk between corner near bicycle rack and connection to 5-103 and 5-104 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 5 | Gap in connection from perimeter sidewalk to 5-103 and 5-104 | Fill gap |

3

| Location | Violation | Retrofit |
|---|---|---|
| Building 5 | Route to units 5-103 and 5-104 has four steps | Create accessible route by creating compliant concrete ramp from the sidewalk in front of Building 5, to the existing walkway in front of 5-103 |
| Building 6 | Sidewalk between connection to 6-101 and connection to units in Building 7 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less or construct as compliant ramp with slope of 8.33% or less, and reduce cross slope to 2% or less on existing concrete walkway |
| Building 6 | Perimeter sidewalk between connection to 6-101 and connection to 6-104 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 6 | Lack of accessible route to trash dumpster | Convert one of two peninsulas next to dumpster into concrete sidewalk; add curb ramp at end of new sidewalk |
| Building 7 | Connection from 7-101 to perimeter sidewalk has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less or construct compliant ramp with slope of 8.33% or less, and reduce cross slope to 2% or less on existing concrete walkway |
| Building 7 | Curb ramp at connection to 7-101/7-102 has running slope that exceeds 8.33% | Reduce running slope to 8.33% or less |
| Building 7 | Perimeter sidewalk between curb ramp and connection to 7-103/7-104 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Buildings 7, 8, and 9 | Lack of accessible route from covered units to public and common use areas | Add crosswalk (perpendicular to vehicular traffic) connecting existing curb ramp and access aisle in front of Building 7 and 9 to sidewalk across driveway (near northwest end of Building 8), and add curb ramp at connection from new crosswalk to sidewalk, in an exact location to be determined |

| Location | Violation | Retrofit |
|---|---|---|
| Building 8 | Connections from perimeter sidewalk to units 8-101 and 8-104 have three and four steps, respectively | Create accessible routes, including by creating compliant concrete ramp or sidewalk from existing sidewalk on north side of Building 8 to existing concrete walkway at 8-101, above steps; and create concrete pathway connecting entrances of 8-101 and 8-104 around storage area |
| Building 8 | Connection from perimeter sidewalk to 8-104 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 8 | Perimeter sidewalk between connection to 8-104 and connection to 8-101 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 8 | Connection from perimeter sidewalk to 8-103 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 9 | Perimeter sidewalk between corner and connection to 9-103/9-104 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building 9 | Connection from perimeter sidewalk to 9-104 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less or construct as compliant ramp with slope of 8.33% or less, and reduce cross slope to 2% or less on existing concrete walkway |
| Entrance | Lack of accessible route to public sidewalk | Construct concrete sidewalk to connect public sidewalk on Hanawai Street to closest part of internal Napilihau sidewalk |
| Grill Area | Lack of accessible route to existing grill area | The Napilihau defendants and the Napilihau AOAO shall negotiate relocating the grills from their original location to a new location where it is easier and less costly to which to provide an accessible route, to which the Napilihau defendants shall provide an accessible route, subject to approval by the United States. |

## APPENDIX A.2
## UNIT RETROFITS AT NAPILIHAU

As set forth in the Consent Order and this Appendix, Defendants Albert C. Kobayashi, Inc. and Martin V. Cooper will make the following retrofits to the covered units at Napilihau:

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| A, B, C | Primary entrance | Door threshold exceeds ½" between exterior/interior floors/surfaces and/or lacks 1:2 bevel on one or both sides of door | Install a Pemko brand ramp or threshold strip, attached to the existing threshold; or install rigid floor mat with beveled edges at the exterior, provided floor mats: (1) Are large enough to allow a wheelchair to maneuver to open the door, (2) provides a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provides a level change across the door threshold no steeper than 1:2 bevel |
| A, B | Patio door | Threshold exceeds ½" between the exterior and interior floor services and lacks 1:2 bevel | Install a Pemko brand ramp or threshold strip, attached to the existing threshold; or\n\nInstall rigid floor mat with beveled edges at the exterior, provided floor mats (1) are large enough to allow a wheelchair to maneuver to open the door, (2) provide a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provide a level change across the door threshold no steeper than 1:2 bevel |
| A, B, C | Unit entrance | Doors lack accessible hardware | Replace interior and exterior knobs with lever handles |
| A | Kitchen | Outlet to right of range not centered from the corner as measured to the centerline | Install surface-mounted outlet, such as a Wiremold product (or similar branded product approved by the United States), |

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | of the outlet closest to the corner | to either a minimum of 25" from the corner, where repositioning the outlet a full 36" would create a hazard, or a minimum of 12" from the refrigerator, as applicable |
| B | Kitchen | Outlet to right of sink is not centered from the corner as measured to the centerline of the outlet closest to the corner | Install surface-mounted outlet, such as a Wiremold product (or similar branded product approved by the United States), to either a minimum of 25" from the corner, where repositioning the outlet a full 36" would create a hazard, or a minimum of 12" from the refrigerator, as applicable |
| A, B | Kitchen | U-shaped kitchen lacks 60" at base of "U" | At owner's election, replace base cabinets with removable base cabinets, subject to compliance with requirements of Fair Housing Design Manual 7.12, 7.15, or remove base cabinets and, if necessary for support, add or move support legs or support brackets, to allow for a compliant forward approach |
| A, B | Hall Bathroom | Door lacks nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width<br><br>Replace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾"<br><br>Where necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward |

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | Where alterations affect the location of light switches, electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor |
| Type B | Master Bathroom | Door lacks nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width<br><br>Replace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾"<br><br>Where necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward<br><br>Where alterations affect the location of light switches, electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor |
| A | Hall bathroom | Insufficient clearance at toilet; toilet not centered 18" from bathtub | Install fold-down grab bar between tub and toilet |
| B | Master bathroom | Insufficient clearance at toilet | Relocate toilet so that center line is 16" to 18" from bathtub or side wall, as applicable |
| B | Master Bathroom | Lacks clear floor space of 30" by 48" | Reverse swing of the bathroom doors to swing outward, if doing so would provide clear floor space to at least 30" x 48" beyond the door swing; and/or |

3

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | Shift toilet back and/or replace toilet with a shorter bowl unit if doing so would provide 30" x 48" of clear floor space beyond the swing of the door; or<br><br>At owner's election, remove base cabinets and/or install removable base cabinets, subject to compliance with requirements of Fair Housing Design Manual 7.49-7.52, if doing so would provide clear floor space to at least 30" by 48" beyond door swing |
| B | Hall Bathroom | Lacks clear floor space of 30" by 48" | Reverse swing of the bathroom doors to swing outward, if doing so would provide clear floor space to at least 30" x 48" beyond the door swing; and/or<br><br>Shift toilet back and/or replace toilet with a shorter bowl unit if doing so would provide 30" x 48" of clear floor space beyond the swing of the door; or<br><br>At owner's election, remove base cabinets and/or install removable base cabinets, subject to compliance with requirements of Fair Housing Design Manual 7.49-7.52, if doing so would provide clear floor space to at least 30" by 48" beyond door swing |
| C | Bathroom | Lacks clear floor space of 30" by 48" | Reverse swing of the bathroom doors to swing outward, if doing so would provide clear floor space to at least 30" x 48" beyond the door swing; and/or |

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | Shift toilet back and/or replace toilet with a shorter bowl unit if doing so would provide 30" x 48" of clear floor space beyond the swing of the door; or<br><br>At owner's election, remove base cabinets and/or install removable base cabinets, subject to compliance with requirements of Fair Housing Design Manual 7.49-7.52, if doing so would provide clear floor space to at least 30" by 48" beyond door swing |
| A | Master bathroom | Lavatory not centered at minimum 24" and less than 33" from bathtub | At owner's election, remove base cabinets and/or install removable base cabinets, subject to compliance with requirements of Fair Housing Design Manual 7.49-7.52; install floating vanity; modify lavatory either by relocating lavatory or trimming the countertop; or replace lavatory with smaller lavatory |
| B | Hall bathroom | Lavatory not centered at minimum 24" and less than 33" from bathtub | At owner's election, remove base cabinets and/or install removable base cabinets, subject to compliance with requirements of Fair Housing Design Manual 7.49-7.52; install floating vanity; modify lavatory either by relocating lavatory or trimming the countertop; or replace lavatory with smaller lavatory |
| B | Master bathroom | Lavatory not centered at minimum 24" and less than 33" from bathtub | At owner's election, remove base cabinets and/or install removable base cabinets, subject to compliance with requirements of Fair Housing Design Manual 7.49-7.52; install |

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | floating vanity; modify lavatory either by relocating lavatory or trimming the countertop; or replace lavatory with smaller lavatory |
| C | Bathroom | Lavatory not centered at minimum 24" and less than 33" from bathtub | At owner's election, remove base cabinets and/or install removable base cabinets, subject to compliance with requirements of Fair Housing Design Manual 7.49-7.52; install floating vanity; modify lavatory either by relocating lavatory or trimming the countertop; or replace lavatory with smaller lavatory |
| B | Both bathrooms | Banjo countertop obstructs future installation of grab bars | Remove banjo countertop; or<br><br>Install support to allow for horizontal mounting of grab bars directly on the banjo countertop, provided that (1) the mounted grab bar is between 33" and 36" above the floor, and (2) Defendants provide engineering documentation to show the additional support could bear at least 250 pounds applied at any point on the grab bar |
| C | Bathroom | Banjo countertop obstructs future installation of grab bars | Remove banjo countertop; or<br><br>Install support to allow for horizontal mounting of grab bars directly on the banjo countertop, provided that (1) the mounted grab bar is between 33" and 36" above the floor, and (2) Defendants provide engineering documentation to show the additional support could bear at |

6

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | least 250 pounds applied at any point on the grab bar |
| A, B, C | All bathrooms | Bathrooms lack reinforcement backing for future installation of grab bars | Install Wingit hollow wall anchor systems or alternative product, subject to approval of United States |
| A | Bedroom | Door lacks nominal 32" clear width | Replace door with sliding barn door to create 31 ¾" clear width |
| B, C | Both bedrooms | Doors lack nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width

Replace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾"

Where necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward

Where alterations affect the location of light switches, electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor |
| A, C | Throughout unit | Light switches higher than 48" from finished floor | Install remote receivers at switch boxes to allow for use of remote control for lights |
| A, B, C | Throughout unit except kitchen | Electrical outlets lower than 15" from finished floor | Relocate outlets to a minimum of 15" above the floor by use of a Wiremold surface-mounted outlet; or

Where the top outlet is situated at 15" or higher above the floor, rotate outlet box 90 degrees so |

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
|  |  |  | that both outlets are 15" or higher above the floor |
| B | At three locations in unit | Level changes that exceed ¼" or ½" with 1:2 bevel | Install 1:2 bevel transition strips |

# APPENDIX B.1
# PUBLIC AND COMMON USE RETROFITS AT NAPILI

As set forth in the Consent Order and this Appendix, Defendants Albert C. Kobayashi, Inc., Design Partners, Inc., Michael N. Goshi, Ronald M. Fukumoto Engineering, Inc., and Rojac Construction Inc. will make the following retrofits to the public and common use areas at Napili:

| Location (buildings referenced by street numbers) | Violation | Retrofit |
|---|---|---|
| 8 | Connection from perimeter sidewalk to Unit 4 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 8 | Clearance at Unit 4 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 8 | Connection from perimeter sidewalk to Unit 3 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 8 | Perimeter sidewalk between connection to Units 3 and 4 and connection to Units 1 and 2 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% and cross slope to 2% on existing concrete walkways |
| 8 | Connection from perimeter sidewalk to Units 1 and 2 has three steps | Replace steps with compliant, concrete pathway or create compliant, concrete pathway via pathways to neighboring units |
| 8 | Perimeter sidewalk between connection to Units 1/2 and connection to Units 1/2 in Building 10 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% and cross slope to 2% on existing concrete walkways |
| 8 | Lack of accessible route to trash dumpster | Create concrete sidewalk over part of grassy peninsula near west end of Building 8, leading from existing sidewalk to road near trash dumpster; add curb ramp at end of new sidewalk; and create crosswalk connecting new curb ramp with dumpster |
| 8 | Gap at trash dumpster greater than 1/2" | Fill gap |

| Location (buildings referenced by street numbers) | Violation | Retrofit |
| --- | --- | --- |
| 10 | Connection from perimeter sidewalk to Unit 1 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 10 | Clearance at Unit 1 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 10 | Clearance at Unit 2 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 10, 16, 101 | Lack of accessible route between certain covered units and certain public/common use areas | Extend existing perimeter sidewalk in front of Building 16 to reach driveway into property with concrete walkway; add curb ramp at end of new concrete sidewalk; and create cross walk running from new curb ramp, across driveway, and then turning at right angle to cross Polohina Lane, and ending at existing access aisle near Building 101 |
| 16 | Connection from perimeter sidewalk to Unit 4 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 16 | Connection from perimeter sidewalk to Unit 3 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 16 | Perimeter sidewalk between the connection to Units 3/4 and the connection to Units 1/2 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 16 | Connection from perimeter sidewalk to Unit 1 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 16 | Perimeter sidewalk - between the connection to Units 1/2 and the connection to Units 3/4 in Building 22 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 22 | Connection from perimeter sidewalk to Units 3 and 4 has two steps | Replace steps with compliant, concrete pathway or create compliant, concrete pathway via pathways to neighboring units |
| 22 | Connection from perimeter sidewalk to Unit 4 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 22 | Connection from perimeter sidewalk to Unit 3 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |

| Location (buildings referenced by street numbers) | Violation | Retrofit |
|---|---|---|
| 22 | Clearance at Unit 3 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 22 | Perimeter sidewalk - between the connection to Units 3/4 and the connection to Units 1/2 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 22 | Connection from perimeter sidewalk to Units 1/2 before the split to each unit has running slope that exceeds 5% | Reduce running slope to 5% or create compliant concrete ramp with slope of 8.33% or less |
| 28 | Perimeter sidewalk between the connection to Units 3/4 and the connection to Units 1/2 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 28 | Perimeter sidewalk between the connection to Units 3/4 and the connection to Units 1/2 has abrupt level change greater than 1/4% | Grind or otherwise create bevel no steeper than 1:2 |
| 28 | Perimeter sidewalk - between the connection to Units 1/2 and the connection to Units 3/4 in Building 32 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 32 | Perimeter sidewalk - between the connection to Units 1/2 and the connection to Units 3/4 in Building 38 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 38 | Perimeter sidewalk - between the connection to Units 1/2 and the connection to Units 3/4 in Building 46 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| Between 46 and 38, near 139, and behind 37 | Lack of accessible route to trash dumpsters | Create openings in dumpster enclosures to allow direct access from sidewalk, and build compliant pathways from sidewalk into dumpster enclosures, at three dumpsters |
| 46 | Connection from the perimeter sidewalk to Units 3/4 has three steps | Replace steps with compliant, concrete pathway or create compliant, concrete pathway via pathways to neighboring units |
| 46 | Clearance at Unit 4 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 46 | Connection to Unit 3 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |

3

| Location (buildings referenced by street numbers) | Violation | Retrofit |
|---|---|---|
| 46 | Clearance at Unit 3 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 46 | Clearance at Unit 2 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 46 | Connection to Unit 1 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 46 | Clearance at Unit 1 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 46, 130, 139 | Lack of accessible route from certain covered units to certain public and common use areas | Create accessible concrete walkway from existing concrete sidewalk that ends near northwest corner of building 46 to sidewalk at mailbox at northeast corner of Hanawai Street and Punohu Lane, by adding concrete sidewalks and curb ramps over existing peninsulas (on each side of terminus of Hanawai Street), and adding cross walk between two new curb ramps |
| 139 | Lack of accessible route from certain covered units to certain public and common use areas | Construct concrete sidewalk to connect terminus of perimeter sidewalk near Building 139 to sidewalk in front of mailbox at northeast corner of Hanawai Street and Punohu Lane |
| 130 | Lack of accessible route from certain covered units to certain public and common use areas | Add crosswalk to connect existing curb ramp at mailbox behind Building 130 and existing curb ramp across street |
| 49 | Clearance at Unit 3 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 49 | Clearance at Unit 4 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 43 | Perimeter sidewalk between the connection to Units 3/4 in Building 49 and Units 3/4 in Building 43 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |

| Location (buildings referenced by street numbers) | Violation | Retrofit |
|---|---|---|
| 43 | Clearance at Unit 3 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 43 | Clearance at Unit 4 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 37 | Perimeter sidewalk between the connection to Units 3/4 in Building 43 and Units 3/4 in Building 37 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 37 | Clearance at Unit 3 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 37 | Clearance at Unit 4 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 37 | Perimeter sidewalk between the connection to Units 3/4 and the corner has gap greater than 1/2" | Fill gap |
| 37 | Perimeter sidewalk between the corner at the rear and the parking access aisle near the mailboxes behind Building 37 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 101 and 37 | Lack of accessible route between certain covered units and certain public/common use areas | Connect existing access aisle in front of Building 101 with existing access aisle at back of building 37, and remove portion of speed bump that overlaps with cross walk |
| 101 | Connection from the perimeter sidewalk to Unit 1 has two steps | Create compliant, concrete pathway as alternative route to unit |
| 101 | Perimeter sidewalk along the left side of the building between the connection to Unit 1 and the corner has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 101 | Perimeter sidewalk along the front of the building between the corner and the connection to Units 2/3 has gaps greater than 1/2" | Fill gaps |
| 101 | Perimeter sidewalk along the front of the building between the corner and the connection to Units 2/3 has abrupt level change greater than 1/4" | Grind or otherwise create bevel no steeper than 1:2 |

| Location (buildings referenced by street numbers) | Violation | Retrofit |
|---|---|---|
| 101 | Perimeter sidewalk along the front of the building between the corner and the connection to Units 2/3 has cross slope greater than 2% | Reduce cross slope to 2% on existing concrete walkway |
| 101 | Connection from perimeter sidewalk to Unit 2 after the split has cross slope greater than 2% | Reduce cross slope to 2% on existing concrete walkway |
| 101 | Connection from perimeter sidewalk to Unit 3 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 101 | Perimeter sidewalk between the connection to Units 2/3 and the connection to Unit 4 has cross slope greater than 2% | Reduce cross slope to 2% on existing concrete walkway |
| 107 | Perimeter sidewalk between the connection to Unit 4 in Building 101 and Units 3/4 in Building 107 has cross slope greater than 2% | Reduce cross slope to 2% on existing concrete walkway |
| 107 | Clearance at Unit 3 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 107 | Clearance at Unit 4 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 115 | Connection from perimeter sidewalk to Unit 2 after the split has cross slope greater than 2% | Reduce cross slope to 2% on existing concrete walkway |
| 115 | Clearance at Unit 2 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 115 | Perimeter sidewalk between the connection to Units 1/2 in Building 115 and the connection to Units 3/4 in Building 121 has cross slope greater than 2% | Reduce cross slope to 2% on existing concrete walkway |
| 121 | Clearance at Unit 3 entrance door has running slope greater than 2% | Reduce running slope to 2% on existing concrete walkway |
| 121 | Clearance at Unit 4 entrance door has running slope greater than 2% | Reduce running slope to 2% on existing concrete walkway |
| 121 | Perimeter sidewalk between the connection to Units 1/2 in Building 121 and the connection to Units 3/4 in Building 127 has running slope greater than 5% and cross slope greater than 2% | Reduce running slope to 5% and cross slope to 2% on existing concrete walkways |

| Location (buildings referenced by street numbers) | Violation | Retrofit |
|---|---|---|
| 121 | Perimeter sidewalk between the connection to Units 1/2 in Building 121 and the connection to Units 3/4 in Building 127 has gap greater than 1/2" | Fill gap |
| 127 | Connection from perimeter sidewalk to Units 3/4 before the split to each unit has cross slope greater than 2% | Reduce cross slope to 2% on existing concrete walkway |
| 127 | Clearance at Unit 3 entrance door has running slope greater than 2% | Reduce running slope to 2% on existing concrete walkway |
| 127 | Clearance at Unit 4 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 127 | Perimeter sidewalk between the connection to Units 3/4 in Building 127 and the connection to Units 1/2 in Building 133 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 133 | Connection from perimeter sidewalk to Unit 1 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% and cross slope to 2% on existing concrete walkways |
| 133 | Perimeter sidewalk between the connection to Unit 1 and the connection to Units 2/3 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or construct compliant, concrete ramp no greater than 8.33%, and reduce cross slope to 2% |
| 133 | Perimeter sidewalk between the connection to Unit 1 and the connection to Units 2/3 has gap greater than 1/2" | Fill gap |
| 133 | Clearance at Unit 2 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 133 | Clearance at Unit 3 entrance door has running slope greater than 2% | Reduce running slope to 2% on existing concrete walkway |
| 133 | Perimeter sidewalk between the connection to Units 2/3 and the connection to Unit 4 has cross slope greater than 2% | Reduce cross slope to 2% on existing concrete walkway |
| 135 | Connection from perimeter sidewalk to Units 1/2 before the split to each unit has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 135 | Clearance at Unit 1 entrance door has slope that exceeds 2% | Reduce slope to 2% on existing concrete walkway |

7

| Location (buildings referenced by street numbers) | Violation | Retrofit |
|---|---|---|
| 135 | Clearance at Unit 2 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 135 | Perimeter sidewalk between the connection to Units 1/2 in Building 135 and the connection to Unit 1 in Building 139 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% and cross slope to 2% on existing concrete walkways |
| 139 | Connection from perimeter sidewalk to Unit 1 has four steps | Replace steps with compliant, concrete pathway or create compliant, concrete pathway via pathway to neighboring units |
| 139 | Clearance at Unit 2 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 139 | Clearance at Unit 3 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 139 | Perimeter sidewalk between the connection to Units 2/3 and the connection to Unit 4 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 139 | Connection from perimeter sidewalk to Unit 4 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 6 | Connection from perimeter sidewalk to Unit 4 has running slope that exceeds 5% near perimeter sidewalk | Reduce running slope to 5% or reconstruct as compliant, concrete ramp with running slope no greater than 8.33% |
| 6 | Clearance at Unit 4 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 6 | Clearance at Unit 3 entrance door has running slop that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 6 | Clearance at Unit 2 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 6 | Left wing ramp on perimeter sidewalk between the connection to Units 2/3 and the connection to Unit 4 has running slope greater than 8.33% | Reduce running slope to 8.33% on existing concrete walkway |
| 6 | Clearance at Unit 1 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |

| Location (buildings referenced by street numbers) | Violation | Retrofit |
|---|---|---|
| 6 and 3 | Lack of accessible route from certain covered units to certain public and common use areas | Connect existing curb ramp near northeast corner of Building 6 to perimeter concrete sidewalk at Building 3 by extending perimeter concrete sidewalk at Building 3 along eastern side of trash dumpster, and then along north side of dumpster; add curb ramp at end of new concrete sidewalk; and create cross walk to connect new curb ramp to existing curb ramp near mailbox |
| 12 | Connection from perimeter sidewalk to Unit 4 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or construct compliant concrete ramp no greater than 8.33%, and reduce cross slope to 2% |
| 12 | Two gaps greater than 1/2" in perimeter sidewalk between the connection to Unit 4 and the connection to Units 2/3 | Fill gaps |
| 12 | Connection from the perimeter sidewalk to Unit 3 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 12 | Connection from the perimeter sidewalk to Unit 2 after the split has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 12 | Perimeter sidewalk between the connection to Units 2/3 and the connection to Unit 1 has gap that exceeds 1/2" | Fill gap |
| 12 | Connection from perimeter sidewalk to Unit 1 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% and cross slope to 2% on existing concrete walkways |
| 12 | Clearance at Unit 1 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 12 | Perimeter sidewalk between the connection to Unit 1 and the trash enclosure has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |

9

| Location (buildings referenced by street numbers) | Violation | Retrofit |
|---|---|---|
| 21 | Perimeter sidewalk between the dead end at the trash enclosure and the connection to Units 1/2 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 21 | Perimeter sidewalk between the dead end at the trash enclosure and the connection to Units 1/2 has abrupt level changes greater than 1/4" | Grind or otherwise create bevel no steeper than 1:2 |
| 21 | Clearance at Unit 1 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 21 | Clearance at Unit 2 entrance door has running slope that exceeds 2% | Reduce running slope to 2% on existing concrete walkway |
| 15 | Perimeter sidewalk between the connection to Building 21 and the connection to Units 3/4, near the connection to Building 21, has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 15 | Perimeter sidewalk between the connection to Units 3/4 and the connection to Units 1/2 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 15 | Perimeter sidewalk between the connection to Units 1/2 and the connection to Unit 4 in Building 9, near the connection to Building 9, has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 9 | Perimeter sidewalk between the connection to Unit 1 and the connection to Units 1/2 in Building 3 has cross slope that exceeds 2% | Reduce cross slope to 2% on existing concrete walkway |
| 130 | Mailboxes and outgoing mail slot are higher than 54", and clear floor space in front of boxes is less than 30" wide; curb ramp extends into clear floor space | Construct mailbox with all boxes and outgoing slot 54" or less, and sufficient clear floor space |
| 139 | Clear floor space at the right mailbox and parcel box stand is less than 30" wide; curb ramp extends into clear floor space | Construct to have sufficient clear floor space |

# APPENDIX B.2
# UNIT RETROFITS AT NAPILI

As set forth in the Consent Order and this Appendix, Defendants Albert C. Kobayashi, Inc., Design Partners, Inc., and Michael N. Goshi will make the following retrofits to the covered units at Napili:

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| A1, A1R, B1, C1, D1 | Primary entrance | Door threshold exceeds ½" between exterior/interior floors/surfaces and/or lacks 1:2 bevel on one or both sides of door | Install a Pemko brand ramp or threshold strip, attached to the existing threshold; or install rigid floor mat with beveled edges at the exterior, provided floor mats: (1) Are large enough to allow a wheelchair to maneuver to open the door, (2) provides a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provides a level change across the door threshold no steeper than 1:2 bevel |
| A1, A1R, B1, C1, D1 | Patio door | Threshold exceeds ½" between the exterior and interior floor services and lacks 1:2 bevel | Install a Pemko brand ramp or threshold strip, attached to the existing threshold; or<br><br>Install rigid floor mat with beveled edges at the exterior, provided floor mats (1) are large enough to allow a wheelchair to maneuver to open the door, (2) provide a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provide a level change across the door threshold no steeper than 1:2 bevel |
| Building 46 | Unit entrance | Doors lack accessible hardware | Replace interior and exterior knobs with lever handles of like quality and materials |
| A1, A1R | Kitchen | Insufficient floor space clearance at refrigerator | Replace refrigerator with counter-depth model as needed |

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | to ensure minimum 40" width, or<br><br>If space allows, reposition refrigerator further back into existing space to make edge flush with counters |
| B1, D1 | Kitchen | Outlets to right and left of range not centered from the corner as measured to the centerline of the outlet closest to the corner | Install surface-mounted outlet, such as a Wiremold product (or similar branded product approved by the United States), to either a minimum of 25" from the corner, where repositioning the outlet a full 36" would create a hazard, or a minimum of 12" from the refrigerator, as applicable |
| C1 | Kitchen | Outlet to the right of range not centered from the corner as measured to the centerline of the outlet closest to the corner | Install surface-mounted outlet, such as a Wiremold product (or similar branded product approved by the United States), to either a minimum of 25" from the corner, where repositioning the outlet a full 36" would create a hazard, or a minimum of 12" from the refrigerator, as applicable |
| A1, A1R, C1, D1 | Kitchen | Sink lacks sufficient clearance; not centered from adjacent base cabinet | At the owner's election, replace base cabinets with removable base cabinets of similar appearance and design, consistent and in compliance with requirements of Fair Housing Design Manual 7.12, 7.15; or remove base cabinets and, where necessary for support, add or move support legs or support brackets, to allow for a compliant forward approach |
| B1 | Kitchen | U-shaped kitchen lacks 60" at base of "U" | At the owner's election, replace base cabinets with removable |

2

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | base cabinet of similar appearance and design, consistent and in compliance with requirements of Fair Housing Design Manual 7.12, 7.15; or remove base cabinets and, where necessary for support, add or move support legs or support brackets, to allow for a compliant forward approach |
| A1, A1R, B1 | Both bathrooms | Doors lack nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width<br><br>Replace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾"<br><br>Where necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward<br><br>Where alterations affect the location of light switches, electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor |
| C1 | Hall bathroom | Door lacks nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width<br><br>Replace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾" |

3

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | Where necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward<br><br>Where alterations affect the location of light switches, electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor |
| C1 | Master bathroom | Door lacks nominal 32" clear width | Relocate door and install offset swing-wide hinges |
| A1, B1 | Both bathrooms | Insufficient clearance at toilet; toilet not centered from bathtub | Relocate toilet so that center line is 16" to 18" from bathtub or side wall, as applicable |
| A1R | Hall bathroom | Insufficient clearance at toilet; toilet not centered from bathtub | Relocate toilet so that center line is 16" to 18" from bathtub or side wall, as applicable |
| C1 | Master bathroom | Insufficient clearance at toilet; toilet not centered from bathtub | Relocate toilet so that center line is 16" to 18" from bathtub or side wall, as applicable |
| A1, B1, C1, D1 | Hall bathroom | Lacks clear floor space of 30" by 48" | Reverse swing of the bathroom doors to swing outward, if doing so would provide clear floor space to at least 30" x 48" beyond the door swing; and/or<br><br>Shift toilet back and/or replace toilet with a shorter bowl unit if doing so would provide 30" x 48" of clear floor space beyond the swing of the door; or<br><br>At the owner's election, remove base cabinets and/or replace with removable vanity cabinet of similar appearance and design, subject to compliance with requirements of Fair |

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | Housing Design Manual 7.49-7.52, if doing so would provide clear floor space to at least 30" by 48" beyond door swing |
| A1, A1R, B1, D1 | Master bathroom | Lavatory not centered at minimum 24" and less than 33" from bathtub | At the owner's election, remove base cabinets and/or replace with removable vanity cabinet of similar appearance and design, consistent and in compliance with requirements of Fair Housing Design Manual 7.49-7.52; install floating vanity; modify lavatory either by relocating lavatory or trimming the countertop; or replace lavatory with smaller lavatory |
| A1, A1R, B1, D1 | Hall bathroom | Lavatory not centered at minimum 24" and less than 33" from bathtub | At the owner's election, remove base cabinets and/or replace with removable vanity cabinet of similar design and appearance, consistent and in compliance with requirements of Fair Housing Design Manual 7.49-7.52; install floating vanity; modify lavatory either by relocating lavatory or trimming the countertop; or replace lavatory with smaller lavatory |
| C1 | Master bathroom | Insufficient clearance at bathtub; clear floor space between toilet and wall counter less than 30" | Replace existing toilet with one with shorter bowl |
| All units | All bathrooms | Bathrooms lack reinforcement backing for future installation of grab bars | Install Wingit hollow wall anchor systems or alternative product, subject to approval of United States |
| A | Bedroom | Door lacks nominal 32" clear width | Replace door with sliding barn door to create 31 ¾" clear width |
| B1 | Bedrooms | Doors lack nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width |

5

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | Replace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾" <br><br> Where necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward <br><br> Where alterations affect the location of light switches, electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor |
| C1 | Master bedroom | Door lacks nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width <br><br> Replace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾" <br><br> Where necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward <br><br> Where alterations affect the location of light switches, electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor <br><br> FOR C1 UNITS WITH SAME LAYOUT AS UNIT 3, BUILDING |

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | 28: Replace door with sliding barn door to increase clearance to minimum 31 ¾" |
| C1 | Master bedroom walk-in closet | Door lacks nominal 32" clear width | Remove door and door jamb, widen entry, and wrap opening with materials to match walls (drywall) |

# APPENDIX C.1
# PUBLIC AND COMMON USE RETROFITS AT WAILEA FAIRWAY

As set forth in the Consent Order and this Appendix, Defendants Albert C. Kobayashi, Inc., Design Partners, Inc., Michael N. Goshi, Stanford Carr Development, LLC, SCD Wailea Fairways, LLC, Sato & Associates, and Goodfellow Bros. LLC will make the following retrofits to the public and common use areas at Wailea Fairway:

| Location | Violation | Retrofit |
|---|---|---|
| Buildings A, B, D, G, J/K, L, M, N, Q, S/T, U, V, and Y | Mailboxes at these buildings have rows that are higher than 54" | Absent objection by the U.S. Postal Service, reduce height of all boxes to 54" or less |
| Building A | Connection between mailboxes and units 101/102 has cross slope that exceeds 2% | Reduce cross slopes to 2% or less on existing concrete walkway |
| Building A | Mailbox has clear floor space of less than 30" | Absent objection by the U.S. Postal Service, reposition mailbox and/or add concrete to create minimum of 30" clear floor space |
| Building B | Top landing of connection from perimeter sidewalk to Units 101/102 has slopes that exceed 2% in multiple directions | Reduce slopes in all directions to 2% or less on existing concrete walkway |
| Building B | Perimeter sidewalk between connection to Units 101/102 and mailboxes has slope that exceeds 5% | Reduce running slope to 5% or less on existing concrete walkway or construct as compliant ramp with slope of 8.33% or less using concrete and railings of like quality and materials as those existing on site |
| Building B | Lack of access from perimeter sidewalk to trash dumpster | Create accessible route to trash dumpster by adding curb ramp and crosswalk at far north end of driveway or compliant ramp |

| Location | Violation | Retrofit |
|---|---|---|
| Buildings B and C | Lack of accessible route to clubhouse | Create one accessible parking space reserved for persons with disabilities in the parking area in front of Buildings B and C. Such space shall be located at parking spaces 24 and 25, which shall be made available for this purpose. Stripe an access aisle and install signage designating this space for persons with disabilities; add crosswalk connecting access aisle to perimeter sidewalk, to allow for vehicular access from Buildings B and C to clubhouse |
| Building C | Perimeter sidewalk between mailboxes and connection to Units 101/102 has ramp slope that exceeds 8.33% | Reduce running slope 8.33% or less on existing concrete walkway |
| Building D | Connection from perimeter sidewalk to Units 101/102 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less on existing concrete walkway or construct as compliant ramp with slope of 8.33% or less using concrete and railing of like quality and materials as those existing on site and reduce cross slopes to 2% or less |
| Building E | Connection from perimeter sidewalk to Units 101/102 has five steps | Replace steps with compliant, concrete pathway or create compliant, concrete pathway via neighboring buildings as alternative route to units |
| Building E | Perimeter sidewalk between connection to Units 101/102 and connection to units in Building F has cross slope that exceeds 2% | Reduce cross slopes to 2% or less on existing concrete walkway |
| Building E | Curb ramp leading to access aisle has running slope that exceeds 8.33% | Reduce running slope 8.33% or less on existing concrete walkway |
| Building F | Connection from perimeter sidewalk to Units 102/103 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building F | Sidewalk between connection to Units 102/103 and connection to Units 101/102 in Building G has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |

| Location | Violation | Retrofit |
|---|---|---|
| Building G | Connection from perimeter sidewalk to connection to entrances to Units 101/102 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less on existing concrete walkway or construct compliant ramp with slope of 8.33% or less, using concrete and railings of like quality and materials as those existing on site and reduce cross slope to 2% or less, or create alternative route to Units 101/102 with compliant, concrete sidewalk |
| Building H | Connection from perimeter sidewalk to Units 102/103 has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% on existing concrete walkway or less or construct compliant ramp with slope of 8.33% or less, using concrete and railings of like quality and materials as those existing on site and reduce cross slope to 2% or less, or create alternative route to Units 102/103 with compliant, concrete sidewalk |
| Building H | Perimeter sidewalk between connection to Units 102/103 and curb ramp has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building J | Connection from perimeter sidewalk to Building J Units 101/102 and Building K Units 101/102, before split, has running slope that exceeds 5% | Reduce running slope to 5% or less on existing concrete walkway or construct as compliant ramp with slope of 8.33% or less using concrete and railings of like quality and materials as those existing on site, or create alternative route to Units 101/102 with compliant, concrete sidewalk |

| Location | Violation | Retrofit |
|---|---|---|
| Building J | Route from Building J to clubhouse, from split to Units 101/102 to connection to clubhouse entrance, has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% on existing concrete walkway or less or construct as compliant ramp with slope of 8.33% or less using concrete and railings of like quality and materials as those existing on site, and reduce cross slope to 2% or less |
| Building J | Connection from perimeter sidewalk to Units 101/102, after split to Building K and before split to clubhouse, has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less on existing concrete walkway or construct as compliant ramp with slope of 8.33% or less using concrete and railings of like quality and materials as those existing on site, and reduce cross slope to 2% or less |
| Building J | Connection from perimeter sidewalk to Units 101/102, between split to clubhouse and unit entrances, has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building J | Curb ramp has running slope that exceeds 8.33% | Reduce running slope 8.33% or less on existing concrete walkway |
| Building J | Access aisle at designated accessible parking space has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building K | Connection from perimeter sidewalk to Units 101/102, between split to Building J and unit entrances, has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building K | Perimeter sidewalk between connection to units and connection to units in Building L has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building K | Connection from perimeter sidewalk to Units 101/102, between split to Building J and unit entrances, has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building L | Perimeter sidewalk between connection to units and mailboxes has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |

| Location | Violation | Retrofit |
|---|---|---|
| Building L | No accessible route from perimeter sidewalk to trash dumpster | Create accessible route to trash area by extending concrete sidewalk alongside roadway (paving over roadway as opposed to grass) to opposite side of trash area, with curb ramp and crosswalk leading to trash area, including moving parking stalls on opposite side of driveway forward to accommodate back-up space; or extend sidewalk on grass alongside roadway with curb ramp and crosswalk opposite and leading to trash area |
| Building M | Connection from perimeter sidewalk to units 101/102 has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building M | Mailbox is not located on pedestrian route | Absent objection by USPS, move mailbox to allow pedestrian route to mailbox |
| Buildings M and U | Lack of accessible route from Building M to public and common use areas | Create accessible route from perimeter sidewalk at Building M to perimeter sidewalk at Building U, including by adding crosswalk (perpendicular to vehicular traffic) connecting southwest end of Building M sidewalk to sidewalk in front of Building U, and adding a curb ramp at each end of crosswalk |
| Building N | Curb ramp from peninsula island has running slope that exceeds 5% | Reduce running slope 8.33% or less on existing concrete walkway |
| Building N | Curb ramp from perimeter sidewalk has running slope that exceeds 5% | Reduce running slope 8.33% or less on existing concrete walkway |
| Building N | Perimeter sidewalk between connection to units and connection to units in Building P has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building P | Sidewalk at side of building between perimeter sidewalk and rear path has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |

| Location | Violation | Retrofit |
|---|---|---|
| Building Q | Perimeter sidewalk curb ramp has running slope that exceeds 8.33% and cross slope that exceeds 2% | Reduce running slope to 8.33% or less and cross slope to 2% or less on existing concrete walkway |
| Building Q | Access aisle for accessible parking spaces has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Buildings Q and R | Connection from perimeter sidewalk, between connection to units in Building R and unit entrances in Building Q, has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less on existing concrete walkway or construct as compliant ramp with slope of 8.33% or less using concrete and railings of like quality and materials as those existing on site, and reduce cross slope to 2% or less |
| Building R | Connection from shared path with Building Q and unit entrances has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less on existing concrete walkway or construct as compliant ramp with slope of 8.33% or less using concrete and railings of like quality and materials as those existing on site, and reduce cross slope to 2% or less |
| Building R | Connection from perimeter sidewalk, between connection to units in Building R and connection to units in Building S, has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building S | Connection from perimeter sidewalk to unit entrances has five steps | Replace steps with compliant, concrete pathway or create compliant concrete pathway via neighboring building as alternative route to units |
| Building S | Perimeter sidewalk between connection to unit entrances and mailboxes has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |

| Location | Violation | Retrofit |
|---|---|---|
| Building S | Lack of accessible route to trash area | Create curb ramp at corner of perimeter sidewalk fronting Building T and create crosswalk to trash area; alternatively, convert grassy peninsula near north end of Building S into an accessible path and create crosswalk to trash area |
| Building T | Connection from perimeter sidewalk to unit entrances has running slope that exceeds 5% | Reduce running slope to 5% or less on existing concrete walkway or construct as compliant ramp with slope of 8.33% or less using concrete and railings of like quality and materials as those existing on site |
| Building U | Curb ramp at corner has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building U | Sidewalk parallel to curb ramp at corner has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building U | Perimeter sidewalk from corner to connection to units has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building U | Abrupt level change greater than 1/4" in front of mailbox | Grind or otherwise create bevel no steeper than 1:2 |
| Building W | Perimeter sidewalk from corner at Building V to connection to units has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less or construct as compliant ramp with slope of 8.33% or less, and reduce cross slope to 2% or less using concrete and railings of like quality and materials as those existing on site |
| Building W | Connection from perimeter sidewalk to unit entrances has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less on existing concrete walkway or construct as compliant ramp with slope of 8.33% or less, and reduce cross slope to 2% or less using concrete and railings of like quality and materials as those existing on site |

7

| Location | Violation | Retrofit |
|----------|-----------|----------|
| Buildings X-Z | Accessible route to clubhouse | Create one accessible parking space reserved for persons with disabilities in the parking area at Buildings X-Z.  Such space shall be located at parking space 224, which shall be made available for this purpose.  Install signage designating this space for persons with disabilities |
| Building X | Perimeter sidewalk from dead end at peninsula to connection to units has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building X | Perimeter sidewalk from connection to unit entrances and curb ramp at Building Y has cross slope that exceeds 2% | Reduce cross slope to 2% or less on existing concrete walkway |
| Building Y | Curb ramp has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 8.33% or less and cross slope to 2% or less on existing concrete walkway |
| Building Y | Connection from perimeter sidewalk to unit entrances has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less on existing concrete walkway or construct as compliant ramp with slope of 8.33% or less, and reduce cross slope to 2% or less using concrete and railings of like quality and materials as those existing on site |
| Building Y | Perimeter sidewalk from connection to unit entrances and to mailboxes has running slope that exceeds 5% and cross slope that exceeds 2% | Reduce running slope to 5% or less on existing concrete walkway or construct as compliant ramp with slope of 8.33% or less, and reduce cross slope to 2% or less using concrete and railings of like quality and materials as those existing on site |

| Location | Violation | Retrofit |
|----------|-----------|----------|
| Clubhouse | Door threshold exceeds ½" on inside side and lacks bevel | Install a Pemko brand ramp or threshold strip, attached to the existing threshold; or install rigid floor mat on inside side with beveled edges, provided floor mat: (1) Is large enough to allow a wheelchair to maneuver to open the door, (2) provides a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provides a level change across the door threshold no steeper than 1:2 bevel |
| Clubhouse | Thresholds at both lounge doors exceed 1/2" and has 1:1 bevel | Modify one door threshold by installing Pemko brand ramps or threshold strips, attached to the existing threshold; or installing rigid floor mats with beveled edges, provided floor mats: (1) Are large enough to allow a wheelchair to maneuver to open the door, (2) provide a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provide a level change across the door threshold no steeper than 1:2 bevel |
| Clubhouse | Drinking fountain spout is more than 36" above finished floor | Lower fountain so that spout is 36" high or less |

| Location | Violation | Retrofit |
|----------|-----------|----------|
| Clubhouse | Kitchen entrance door threshold is ½" or higher on both sides and lacks bevels | Install Pemko brand ramps or threshold strips, attached to the existing threshold; or install rigid floor mats with beveled edges on both sides, provided floor mats: (1) Are large enough to allow a wheelchair to maneuver to open the door, (2) provide a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provide a level change across the door threshold no steeper than 1:2 bevel |
| Clubhouse | Fitness center door threshold exceeds ½" on both sides and lacks bevels | Install Pemko brand ramps or threshold strips, attached to the existing threshold; or install rigid floor mats with beveled edges on both sides, provided floor mats: (1) Are large enough to allow a wheelchair to maneuver to open the door, (2) provide a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provide a level change across the door threshold no steeper than 1:2 bevel |
| Clubhouse | Fitness center thermostat exceeds 54" above finished floor | Replace thermostat with remote-controlled model and mount remote control at 54" or less above finished floor |
| Clubhouse | Three lighting sconces protrude more than 4", are mounted less than 80" above finished floor, and do not have cane detectable barrier | Replace with models that protrude 4" or less |

# APPENDIX C.2
## UNIT RETROFITS AT WAILEA FAIRWAY

As set forth in the Consent Order and this Appendix, Defendants Albert C. Kobayashi, Inc., Design Partners, Inc., Michael N. Goshi, Stanford Carr Development, LLC, and SCD Wailea Fairways, LLC will make the following retrofits to the covered units at Wailea Fairway:

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| All units | Primary entrance | Door threshold exceeds ½" between exterior/interior floors/surfaces and/or lacks 1:2 bevel on one or both sides of door | Install a Pemko brand ramp or threshold strip, attached to the existing threshold; or install rigid floor mat with beveled edges at the exterior, provided floor mats: (1) Are large enough to allow a wheelchair to maneuver to open the door, (2) provides a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provides a level change across the door threshold no steeper than 1:2 bevel |
| All units | Patio door—interior side | Threshold exceeds ½" between the exterior and interior floor services and lacks 1:2 bevel | Install a Pemko brand ramp or threshold strip, attached to the existing threshold; or

Install rigid floor mat with beveled edges at the exterior, provided floor mats (1) are large enough to allow a wheelchair to maneuver to open the door, (2) provide a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provide a level change across the door threshold no steeper than 1:2 bevel |
| All units | Unit entrance | Doors lack accessible hardware | Replace interior and exterior knobs with lever handles |

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| All units | Kitchen | Insufficient floor space clearance at refrigerator | Replace refrigerator with counter-depth model as needed to ensure minimum 40" width |
| All units | Kitchen | Outlet to left of range not centered from the corner as measured to the centerline of the outlet closest to the corner | Install surface-mounted outlet, such as a Wiremold product (or similar branded product approved by the United States), to either a minimum of 25" from the corner, where repositioning the outlet a full 36" would create a hazard, or a minimum of 12" from the refrigerator, as applicable |
| All units | Kitchen | Sink lacks sufficient clearance; not centered from adjacent base cabinet | At the owner's election, replace base cabinets with removable base cabinet of similar appearance and design, consistent and in compliance with requirements of Fair Housing Design Manual 7.12, 7.15; or remove base cabinets and, where necessary for support, add or move support legs or support brackets, to allow for a compliant forward approach |
| All units | Both bathrooms | Doors lack nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width

Replace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾"

Where necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward

Where alterations affect the location of light switches, |

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor |
| All units | Hall bathroom | Lacks clear floor space of 30" by 48" | Reverse swing of the bathroom doors to swing outward, if doing so would provide clear floor space to at least 30" x 48" beyond the door swing; and/or

Shift toilet back and/or replace toilet with a shorter bowl unit if doing so would provide 30" x 48" of clear floor space beyond the swing of the door; or

At the owner's election, remove base cabinets and/or replace base cabinets with removable vanity cabinet of similar appearance and design, consistent and in compliance with requirements of Fair Housing Design Manual 7.49-7.52, if doing so would provide clear floor space to at least 30" by 48" beyond door swing |
| All units | Hall bathroom | Lavatory not centered at minimum 24" and less than 33" from bathtub | At the owner's election, remove base cabinets and/or replace base cabinets with removable vanity cabinet of similar appearance and design, consistent and in compliance with requirements of Fair Housing Design Manual 7.49-7.52; install floating vanity; modify lavatory either by relocating lavatory or trimming the countertop; or replace lavatory with smaller lavatory |

3

| Unit Type(s) | Location | Violation | Retrofit |
|---|---|---|---|
| All units | Both bathrooms | Banjo countertop obstructs future installation of grab bars | Remove banjo countertop; or<br><br>Install support to allow for horizontal mounting of grab bars directly on the banjo countertop, provided that (1) the mounted grab bar is between 33" and 36" above the floor, and (2) Defendants provide engineering documentation to show the additional support could bear at least 250 pounds applied at any point on the grab bar |
| All units | All bathrooms | Bathrooms lack reinforcement backing for future installation of grab bars | Install Wingit hollow wall anchor systems or alternative product, subject to approval of United States |
| All units | Bedroom | Door lacks nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width<br><br>Replace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾"<br><br>Where necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward<br><br>Where alterations affect the location of light switches, electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor |

4

## APPENDIX D.1
## PUBLIC AND COMMON USE AREA RETROFITS
## AT PALEHUA TERRACE

As set forth in the Consent Order and this Appendix, Defendants Albert C. Kobayashi, Inc., Fritz Johnson, Inc., and Frederick M. Johnson will make the following retrofits to the public and common use areas at Palehua Terrace:

| Location | Violation | Retrofit |
| --- | --- | --- |
| Buildings A &B | No accessible route to mailboxes | Pave continuous concrete or asphalt sidewalk alongside parking areas in front of Buildings A & B.  Install new mailboxes for Buildings A & B at location alongside sidewalk in front of Buildings A & B. |
| Building A | No accessible route to accessible parking at Building B | Pave continuous concrete or asphalt sidewalk alongside parking areas in front of Buildings A & B as required above. |
| Buildings A & B | No accessible route to trash area | Pave continuous concrete or asphalt sidewalk alongside parking areas in front of Buildings A & B as required above.  Pave concrete walkway from sidewalk over parking area peninsula between Buildings A and B.  Install curb ramp at peninsula and striped crosswalk from peninsula to trash area.  If necessary, alter or relocate speed bump. |
| Building A | Curb ramp at connection from parking to units A205/A206 has running slope exceeding 8.33% | Reduce running slope to 8.33% |
| Building A | Curb ramp at connection from parking to units A201/A202 has cross slope exceeding 2% | Reduce cross slope to 2% or less |

| Location | Violation | Retrofit |
|----------|-----------|----------|
| Building B | Bridge to units B205/B206 has slope that exceeds 5% | install handrails on both sides of bridge or install new bridge surface with slope of 5% or less |
| Building B | Sidewalk between connection to units B205/B206 and B203/B204 has cross slopes exceeding 2% | Reduce cross slopes to 2% or less |
| Building B | Sidewalk between connection to units B203/B204 and B201/B202 has cross slopes exceeding 2% | Reduce cross slopes to 2% or less |
| Building B | Connection between sidewalk and bridge to units B201/B202 has cross slopes exceeding 2% | Reduce cross slopes to 2% or less |
| Building B | Curb ramp at connection to parking at units B201/B202 has running slopes exceeding 8.33% | Reduce running slope to 8.33% |
| Building C | Bridge to units C205/C206 has slope that exceeds 5% | Install handrails on both sides of bridge; or install new bridge surface with slope of 5% or less |
| Building C | Sidewalk between connection to units C205/C206 and mailboxes has cross slopes exceeding 2% | Reduce cross slopes to 2% or less |
| Building C | Sidewalk between connection to units C205/C206 and C203/C204 has cross slopes exceeding 2% | Reduce cross slopes to 2% or less |
| Building C | Right wing of curb ramp at connection to units C205/C206 has running slopes exceeding 8.33% and cross slopes exceeding 2% | Reduce running slope to 8.33% or less and cross slope to 2% or less |

2

| Location | Violation | Retrofit |
|---|---|---|
| Building C | Connection from bridge to entrances to units C201/C202 has noncompliant abrupt level change | Install Pemko brand ramp |
| Building D | Bridge to units D205/D206 has slope that exceeds 5% | install handrails on both sides of bridge or install new bridge surface with slope of 5% or less |
| Building D | Sidewalk between connection to units D205/D206 and curb ramp has cross slopes exceeding 2% | Reduce cross slopes to 2% or less |
| Building D | Ramped portion of sidewalk between connections to units D205/D206 and D203/D204 has running slope exceeding 8.33% on right wing of ramp and cross slope exceeding 2% on left wing of ramp | Reduce running slope to 8.33% or less and cross slope to 2% or less |
| Building D | Sidewalk between connection to units D203/D204 and curb ramp has cross slopes exceeding 2% | Reduce cross slopes to 2% or less |
| Building D | Sidewalk between connection to units D203/D204 and D201/D202 has cross slopes exceeding 2% | Reduce cross slopes to 2% or less |
| Building D | Connection from bridge to entrances to units D201/D202 has noncompliant abrupt level change | Install Pemko brand ramp |
| Buildings D, E | Sidewalk between connection to units D201/D202 and E105/E106 has cross slopes exceeding 2% | Reduce cross slopes to 2% or less |
| Building E | Connection from bridge to entrances to units E204/E205 | Install Pemko brand ramp |

3

| Location | Violation | Retrofit |
|---|---|---|
| | has noncompliant abrupt level change | |
| Building E | Sidewalk between connection to units E203/E204 and E201/E202 has cross slopes exceeding 2% | Reduce cross slopes to 2% or less |
| Building E | Connection from bridge to entrances to units E201/E202 has noncompliant abrupt level change | Install Pemko brand ramp |
| Building E | Curb ramp at connection from parking to sidewalk at units E201/E202 has running slope exceeding 8.33% | Reduce running slope to 8.33% or less |
| Buildings F, G | No accessible route to park, mailboxes | Install continuous concrete or asphalt sidewalk alongside parking area from Building E to Building G.

Install curb ramp at peninsula in front of units F203/F204 and striped crosswalk from peninsula to existing curb ramp near maintenance building.  Note:  existing ramp must comply with Guidelines requirements for running and cross slopes. |
| Building F | Connection from bridge to entrances to units F205/F206 has noncompliant abrupt level change | Install Pemko brand ramp |
| Building F | Connection from bridge to entrances to units F203/F204 has noncompliant abrupt level change | Install Pemko brand ramp |
| Building F | Curb ramp between parking and connection to units F201/F202 has running slope exceeding 8.33% and cross slope exceeding 2% | Reduce running slope to 8.33% or less and cross slope to 2% or less |

4

| Location | Violation | Retrofit |
|----------|-----------|----------|
| Building F | Connecting sidewalk between curb ramp and bridge to units F201/F202 has cross slope exceeding 2% | Reduce cross slopes to 2% or less |
| Buildings F, G | No accessible route to trash area | Add curb ramp to end of peninsula in front of units F205/F206; install striped crosswalk leading to trash area |
| Building G | Curb ramp from parking to connecting sidewalk at units G205/G206 has cross slope exceeding 2% | Reduce cross slopes to 2% or less |
| Building G | Bridge to units G205/G206 has slope that exceeds 5% | Install handrails on both sides of bridge; or install new bridge surface with slope of 5% or less |
| Building G | Connection from bridge to entrances to units G205/G206 has noncompliant abrupt level change | Install Pemko brand ramp |
| Building G | Curb ramp from parking to connecting sidewalk at units G203/G204 has cross slope exceeding 2% | Reduce cross slopes to 2% or less |
| Building G | No accessible route to units G201/G202; bridge has four steps leading to connection to parking area | Create accessible route to these units |

5

# APPENDIX D.2
## UNIT RETROFITS AT PALEHUA TERRACE

As set forth in the Consent Order and this Appendix, Defendants Albert C. Kobayashi, Inc., Fritz Johnson, Inc., and Frederick M. Johnson will make the following retrofits to the covered units at Palehua Terrace:

| Units | Location | Violation | Retrofit |
|---|---|---|---|
| All units except where threshold is already beveled | Primary entrance | Door threshold exceeds ½" between exterior/interior floors/surfaces and/or lacks 1:2 bevel on one or both sides of door | Install a Pemko brand ramp or threshold strip, attached to the existing threshold; or install rigid floor mat with beveled edges at the exterior, provided floor mats: (1) Are large enough to allow a wheelchair to maneuver to open the door, (2) provides a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provides a level change across the door threshold no steeper than 1:2 bevel |
| All units | Patio doors | Threshold exceeds ½" between the exterior and interior floor services and lacks 1:2 bevel | install a Pemko brand ramp or threshold strip, attached to the existing threshold; or<br><br>Install rigid floor mat with beveled edges at the exterior, provided floor mats (1) are large enough to allow a wheelchair to maneuver to open the door, (2) provide a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provide a level change across the door threshold no steeper than 1:2 bevel |
| Buildings B, E, F, G | Unit entrances | Doors lack accessible hardware | Replace interior and exterior knobs with lever handles of like quality and materials |
| All units | Kitchen | Insufficient floor space clearance at refrigerator | Replace refrigerator with counter-depth model as needed |

| Units | Location | Violation | Retrofit |
|---|---|---|---|
| | | | to ensure minimum 40" width, or<br><br>If space allows, reposition refrigerator further back into existing space to make edge flush with counters |
| All units | Kitchen | Outlets to right and left of sink or range is not centered from the corner as measured to the centerline of the outlet closest to the corner | Install surface-mounted outlet, such as a Wiremold product (or similar branded product approved by the United States), to either a minimum of 25" from the corner, where repositioning the outlet a full 36" would create a hazard, or a minimum of 12" from the refrigerator, as applicable<br><br>NOTE:  For units where there are two outlets between range and sink and no other obstructions between them (*e.g.*, C205), only one outlet need be relocated |
| All units except those with same layout as B201 | Kitchen | U-shaped kitchen lacks 60" at base of "U"; countertop centerline less than 24" from face of range with no removable base cabinet | Replace base cabinets with removable base cabinets of originally specified appearance and design, subject to compliance with requirements of Fair Housing Design Manual 7.12, 7.15; or remove base cabinets and, where necessary for support, add or move support legs or support brackets, to allow for a compliant forward approach |
| All units | All bathrooms where toilet is centered less than 16" from bathtub | Insufficient clearance at toilet; toilet not centered 18" from bathtub | Relocate toilet so that center line is 16" to 18" from bathtub or side wall, as applicable |

| Units | Location | Violation | Retrofit |
|-------|----------|-----------|----------|
| All units | All bathrooms | Lacks clear floor space of 30" by 48" | Reverse swing of the bathroom doors to swing outward, if doing so would provide clear floor space to at least 30" x 48" beyond the door swing; and/or<br><br>Shift toilet back and/or replace toilet with a shorter bowl unit if doing so would provide 30" x 48" of clear floor space beyond the swing of the door; or<br><br>Remove base cabinets and/or install removable base cabinets of originally specified appearance and design, subject to compliance with requirements of Fair Housing Design Manual 7.49-7.52, if doing so would provide clear floor space to at least 30" by 48" beyond door swing |
| Units with same layout as C205 | Hall bathroom | Lavatory not centered at minimum 24" and less than 33" from bathtub | Remove base cabinets and/or install removable base cabinets of originally specified appearance and design, subject to compliance with requirements of Fair Housing Design Manual 7.49-7.52; install floating vanity; modify lavatory either by relocating lavatory or trimming the countertop; or replace lavatory with smaller lavatory |
| Units with same layout as B201 | Both bathrooms | Banjo countertop obstructs future installation of grab bars | Remove banjo countertop; or<br><br>Install support to allow for horizontal mounting of grab bars directly on the banjo countertop, provided that (1) the mounted grab bar is between 33" and 36" above the floor, and (2) Defendants |

| Units | Location | Violation | Retrofit |
|-------|----------|-----------|----------|
| | | | provide engineering documentation to show the additional support could bear at least 250 pounds applied at any point on the grab bar |
| All units | All bathrooms | Bathrooms lack reinforcement backing for future installation of grab bars | Install Wingit hollow wall anchor systems or alternative product, subject to approval of United States |
| All units | Throughout unit except kitchen | Electrical outlets lower than 15" from finished floor | Relocate outlets to a minimum of 15" above the floor by use of a Wiremold surface-mounted outlet; or<br><br>Where the top outlet is situated at 15" or higher above the floor, rotate outlet box 90 degrees so that both outlets are 15" or higher above the floor |

# APPENDIX E.1
## PUBLIC AND COMMON USE AREA RETROFITS AT KAHULUI

As set forth in the Consent Order and this Appendix, Defendants Albert C. Kobayashi, Inc., and GYA Architects will make the following retrofits to the public and common use areas at Kahului:

| Location | Violation | Retrofit |
|---|---|---|
| Building A | No accessible route to first floor of units | Construct vertical enclosed weather-resistant platform lift at east stairwell from grade to first level of units; lift shall be substantially similar to "AmeriGlide Hercules Enclosed Vertical Platform Lift" (see AmeriGlide Hercules Enclosed Vertical Platform Lift (4-stair-lifts.com)) |
| Building B | No accessible route to first floor of units | Construct vertical enclosed weather-resistant platform lift at east stairwell from grade to first level of units; lift shall be substantially similar to "AmeriGlide Hercules Enclosed Vertical Platform Lift" (see AmeriGlide Hercules Enclosed Vertical Platform Lift (4-stair-lifts.com)) |
| Building C | No accessible route to first floor of units | Construct vertical enclosed weather-resistant platform lift at northeast stairwell from grade to first level of units; lift shall be substantially similar to "AmeriGlide Hercules Enclosed Vertical Platform Lift" (see AmeriGlide Hercules Enclosed Vertical Platform Lift (4-stair-lifts.com)) |

| Location | Violation | Retrofit |
|---|---|---|
| Parking | No accessible route from Buildings A, B, and C to accessible parking located at Building D | Construct concrete or asphalt sidewalk leading from the sidewalk alongside the mailbox at Building C to the sidewalk along the parking lot at Building D.<br><br>Install curb ramps and striped crosswalks leading from Building A to Building B and from Building B to Building C |
| Rental office | No accessible route from Buildings A, B, and C to rental office | See above |
| Building A trash area | No accessible route to trash area | Construct curb ramp leading to paved area in front of trash area and striped walkway to trash area; walkway must be limited to driveway leading only to trash area |
| Building B trash area | No accessible route to trash area | Lower cross slopes in excess of 2% on sidewalk from Building B to trash area; where needed |
| Building D mailboxes | Outgoing mail slot is at 58 ½" | Lower outgoing mail slot to maximum of 54" above finished floor |
| Buildings A and C mailboxes | Cross slopes on pavement in front of mailboxes exceed 2% | Lower slopes to 2% |

## APPENDIX E.2
## UNIT RETROFITS AT KAHULUI

As set forth in the Consent Order and this Appendix, Defendants Albert C. Kobayashi, Inc., and GYA Architects will make the following retrofits to the covered units at Kahului:

| Unit(s) | Location | Violation | Retrofit |
|---------|----------|-----------|----------|
| Buildings A, B, C, units on first level above parking area | Primary entrance | Door threshold exceeds ½" between exterior/interior floors/surfaces and/or lacks 1:2 bevel on one or both sides of door | Install a Pemko brand ramp or threshold strip, attached to the existing threshold; or install rigid floor mat with beveled edges at the exterior, provided floor mats: (1) Are large enough to allow a wheelchair to maneuver to open the door, (2) provides a minimum 5' x 5' area that is within ½" of the interior floor level, and (3) provides a level change across the door threshold no steeper than 1:2 bevel |
| All units | Kitchen | Insufficient clearance at cabinets | Replace refrigerator with counter-depth model as needed to ensure minimum 40" width, or<br><br>If space allows, reposition refrigerator further back into existing space to make edge flush with counters, AND<br><br>Remove base cabinets and, where necessary for support, add or move support legs or support brackets, to allow for a compliant forward approach |
| Building D | Kitchen | Insufficient clearance at refrigerator | Replace refrigerator with counter-depth model as needed to ensure minimum 40" width, or |

| Unit(s) | Location | Violation | Retrofit |
|---|---|---|---|
| | | | If space allows, reposition refrigerator further back into existing space to make edge flush with counters |
| Building D | Kitchen | Outlet to left of sink higher than 46" above finished floor | Install surface-mounted outlet, such as a Wiremold product (or similar branded product approved by the United States), to no higher than 46" above finished floor |
| Buildings A, B, C, units on first level above parking area | Kitchen | Outlet to right of sink higher than 46" above finished floor | Install surface-mounted outlet, such as a Wiremold product (or similar branded product approved by the United States), to no higher than 46" above finished floor |
| All units | Bathrooms | Doors lacks nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width

Replace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾"

Where necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward

Where alterations affect the location of light switches, electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor |
| All units | Bathrooms | Insufficient clearance at toilet; toilet not centered 18" from bathtub | Provide 1" blocking to mount grab bars on side wall adjacent to toilet to ensure grab bars are 18" from centerline of toilet |

| Unit(s) | Location | Violation | Retrofit |
|---|---|---|---|
| All units | Bathrooms | Lack clear floor space of 30" by 48" | Reverse swing of the bathroom doors to swing outward, if doing so would provide clear floor space to at least 30" x 48" beyond the door swing |
| All units | Bathrooms | Lavatory not centered at minimum 24" and less than 33" from bathtub | Install floating vanity; modify lavatory either by relocating lavatory or trimming the countertop; or replace lavatory with smaller lavatory |
| All units | All bathrooms | Bathrooms lack reinforcement backing for future installation of grab bars | Install Wingit hollow wall anchor systems or alternative product, subject to approval of United States |
| Building D | Bedroom | Door lacks nominal 32" clear width | Replace door and frame with a door size appropriate to provide the minimum 31 ¾" clear width\n\nReplace existing hinges with offset swing-wide hinges to increase width to the minimum 31 ¾"\n\nWhere necessary, create a recess pocket in the wall to accommodate the lever set and/or reverse door swing to swing outward\n\nWhere alterations affect the location of light switches, electrical outlets, thermostats, and/or other environmental controls, the relocated controls will be placed between 15" and 48" from the floor |
| All units | Throughout unit | Light switches higher than 48" from finished floor | Install remote receivers at switch boxes to allow for use of remote control for lights |

**APPENDIX F**
**NOTICE TO UNIT OWNERS AT**
**NAPILIHAU, NAPILI, AND WAILEA FAIRWAY**

Dear Unit Owner:

You are receiving this notice as part of a settlement of the lawsuit called *United States v. Albert C. Kobayashi, Inc.* That lawsuit involved whether certain condominium complexes, including [YOUR PROPERTY], were designed and constructed to be accessible to people with disabilities.

The federal Fair Housing Act requires that single-story, ground-floor units in multifamily properties constructed after March 13, 1991, have certain accessible features for persons with disabilities. The Fair Housing Act also requires that routes and public and common use areas in these properties have certain accessible features. The United States alleges that the interiors of single-story, ground floor units, routes, and public and common use areas at _____ [Subject Property] do not comply with the Fair Housing Act.

A settlement has been reached between the United States and the entities that designed and constructed [property name]. As a result of this settlement, those responsible for designing and building _____ [Subject Property] have agreed to make certain retrofits to the interiors of covered ground floor units. The purpose of the retrofits is to provide greater accessibility.

Your unit may qualify for certain retrofits. If your unit qualifies for retrofits, you may choose to have some or all of these retrofits done *at no cost to you*. You may also choose to have no retrofits done to your unit. If you choose to have some or all of the retrofits done, then a Neutral Inspector will conduct a pre-retrofit inspection of your unit to confirm whether or not a violation exists.

Depending on the features of your unit, the retrofits may include:

- Replacing the hardware at the unit's entrance door from a knob to a lever.

- Reducing level changes and thresholds at the unit's entrance and patio doors.

- Widening interior doorways, reversing the swing direction of doors, and/or replacing door hinges, so that the resulting interior doorway

would be wide enough for a person using a wheelchair to pass through.  This retrofit modification may include replacing the door and any necessary drywall, painting and floor finishing to restore the retrofitted areas to be "consistent" with the surrounding finishes (as described further below).

For Napili and Wailea Fairway, see illustrative drawings attached hereto.

- Widening doors to walk-in closets.  For Napili, see illustrative drawings attached hereto.

- Widening hallways to be wide enough for a person using a wheelchair to pass through.

- Replacing and/or retrofitting kitchen cabinets to provide sufficient clear floor space to allow a person using a wheelchair to access and use the kitchen and its fixtures.  This may include relocating or, if necessary, replacing a refrigerator (which may be a smaller refrigerator) and sink (which may be a smaller sink), installing a removable base cabinet, and/or relocating electrical outlets. For Napili and Wailea Fairway, see illustrative drawings attached hereto.

- Reconfiguring fixtures within the bathroom(s) to provide sufficient clear floor space to allow a person using a wheelchair to access and use the bathroom(s) and its fixtures.  This modification may include relocating or replacing the bathroom toilet(s) (with a smaller toilet) and lavatory (with a smaller lavatory) and installing a removable cabinet. This work will include all necessary drywall, painting and floor finishing to be replaced.  For Napili and Wailea Fairway, see illustrative drawings attached hereto.

- Removing or altering the banjo countertop(s) in the bathroom(s) that obstruct grab bar locations near toilets. For Wailea Fairway, see illustrative drawings attached hereto.

- Relocating electrical outlets and/or light switches to be within reach of a person using a wheelchair.  For Napili and Wailea Fairway, see picture attached hereto.

2

These retrofits should not require extensive alterations or removal of existing features in your unit. However, if any features of your unit need to be altered or replaced in order to install these retrofits, those features will be replaced with materials that are "consistent" in appearance with the surrounding finishes. "Consistent" means that the replacement materials will have similar appearance, color, gloss or sheen, and texture, such as use of laminates or veneers instead of hardwood. For example, in replacing a door, kitchen cabinet, or bathroom vanity, the features that are altered or replaced will be "consistent" in appearance but may not exactly match the surrounding features. Furthermore, any upgraded luxury materials, such as stone, quartz, tile, or wood, will not be replaced. For a fuller description of these terms, see [USDOJ website link to consent Order].

In order to have your unit retrofitted, **you must complete the attached Accessibility Retrofits Selection Form and return it no later than _____(DATE) _____.** Please use this form to select from the list of available retrofits for which your unit may qualify. You may mail in the form in the prepaid envelope enclosed with this notice, fax the form to XXX-XXX-XXXX, or email the form to XXXX@XXXX.XXX. If you do not want your unit to be retrofitted, no action is needed on your part. Please note that any inaccessible features within your unit caused by renovations made after your unit was originally constructed do not qualify for retrofits.

Upon receiving your Accessibility Retrofits Selection Form, a Neutral Inspector will contact you to schedule a short inspection of your unit to verify the retrofits for which your unit is eligible.

When scheduling the retrofits, we will work with you and take into account your availability, preferences and convenience. If, as a result of the retrofits, you expect to experience undue inconvenience or hardship, you may elect to relocate and will be paid the applicable government per diem rate for food and lodging for each day you are relocated. "Undue inconvenience or hardship" includes, but is not limited to, excessive dust, noise, disruption or interference with the owner's or resident's day-to-day activities or affairs for a period of twenty-four (24) consecutive hours or more. Additionally, the contractor performing the retrofits may ask you to vacate your unit if staying there would cause undue inconvenience or hardship. The contractor may also ask you to move or remove certain personal property near areas to be retrofitted.

Finally, if you have any legal questions about the relief described in this notice, you should consult your own attorney.

**APPENDIX G**
**ACCESSIBILITY RETROFITS SELECTION FORM FOR NAPILIHAU,**
**NAPILI AND WAILEA**
**[To be modified specific to each property]**

Name(s):    _____

Address:    _____

I (we) am (are) the owner(s) of the unit named above.  I (we)would like the following retrofits to be made to my(our)  unit (check any or all):

_____ Replacing the hardware at the unit's entrance door from a knob to a lever. (An example of the hardware, or one similar to it, is attached.)

_____ Reducing level changes and thresholds at the unit's entrance and patio doors.  (An example of the hardware, or one similar to it, is attached.)

_____ Widening doorways, reversing the swing direction of doors, or replacing door hinges, so that the resulting interior doorway would be wide enough for a person using a wheelchair to pass through.  This modification would include replacing the door and any resulting necessary wall and floor finishing.  (An example of the door hinge and door, or one similar to it, is attached.)

_____ Widening doors to walk-in closets.  (An example of the door, or one similar to it, is attached.)

_____ Widening hallways to be wide enough for a person using a wheelchair to pass through.

_____ Reconfiguring the kitchen to provide sufficient clear floor space to allow a person using a wheelchair to access and use the kitchen and its fixtures. This modification may include relocating or replacing a refrigerator and/or sink, installing a removable base cabinet, and relocating outlets, and would include any necessary floor and wall finishing.  (Examples of the refrigerator and sink are attached.)

_____ Reconfiguring the bathroom(s) to provide sufficient clear floor space to allow a person using a wheelchair to access and use the bathroom(s) and its

fixtures.  This modification may include replacing or relocating the bathroom toilet(s) and lavatory or installing a removable cabinet, and would include any necessary floor and wall finishing.  (Examples of the toilet and lavatory are attached.)

_____ Removing or altering the banjo countertop(s) in the bathroom(s) that obstruct grab bar locations near toilets.

_____ Relocating or modifying electrical outlets and/or light switches to be within reach of a person using a wheelchair, including providing a remote device to control light switches.  (Examples will be provided)

If you do not want any retrofit modifications done to your unit, you do not need to take any action or return this form.


I understand these retrofits are being made under a Consent Order in *United States v. Albert C. Kobayashi, Inc., et al.*, No. 19-531 (U.S.D.C., D. Hawaii).  I authorize the Neutral Inspector, selected by the United States and the defendants in this case, to inspect my unit, upon _____ days' notice, to determine whether my unit is eligible for some or all of the retrofits I selected above.

---

SIGNATURE

---

DATE

**IMPORTANT:  THIS FORM MUST BE RETURNED BY___(DATE)_____. Failing to return this form by that date means that your unit will not be eligible for retrofits.**

**APPENDIX H**
**NOTICE TO RESIDENTS OF PALEHUA TERRACE**
**AND KAHULUI TOWN TERRACE**

Dear Resident:

The federal Fair Housing Act requires that ground-floor units in multifamily properties constructed after March 13, 1991, have certain accessible features for persons with disabilities. The Fair Housing Act also requires that routes and public and common use areas in these properties have accessible features.

The United States alleges that the interiors of the units, the routes, and the public and common use areas at _____ [Subject Property] do not comply with the Fair Housing Act. As a result of a settlement with the United States, those responsible for designing and building _____ [Subject Property] have agreed to make certain retrofits to provide greater accessibility. Your unit will be retrofitted to provide greater accessibility within one year from [date of entry of consent order].

You may request to schedule when your unit is modified *at no cost to you*. The actual work will take no longer than ___ days from the date construction begins. In scheduling when the retrofits will take place, _____ [Defendants' point of contact] will take into account your preferences and convenience. If you are dislocated from your unit for more than twenty-four (24) hours consecutively, you will be paid the applicable government per diem rate for food and lodging for each day of inconvenience.

Please let us know if you are interested in having the work done now and we will provide you with additional information.

[Defendants' point of contact]    and    [Rule 19 Defendant]
[contact information]                         [contact information]

**APPENDIX I**
**NOTICE TO NAPILI UNIT OWNERS OF THE**
**NAPILI ACCESSIBILITY FUND**

[Date]

Dear Napili Owner:

As part of a settlement in the lawsuit *United States v. Albert C. Kobayashi, Inc.*, the defendants have established the "Napili Accessibility Fund" to reimburse owners, up to a certain limit, for accessibility-related retrofits you may wish to install within your unit.

These funds for accessibility-related retrofits are in addition to the retrofits that the defendants are required to provide to owners of all single-story, first-floor units, i.e. the "covered units". All unit owners, including owners of the single-story, ground floor units, may apply for reimbursement of costs for accessibility-related work from the Napili Accessibility Fund.

Napili Villas HOA, Inc. (the "Association"), your owners' association, has been charged with administering the Fund and is required to process requests for reimbursement on a first-come, first-served basis. In order to qualify for reimbursement of accessibility-related work, you must (1) submit a request for the proposed accessibility-related work, explaining why the proposed feature would enhance the immediate usability of your unit for persons with disabilities; (2) receive written approval by the Association for the proposed work; and (3) submit documentation, to the satisfaction of the Association, establishing that the accessibility-related work was performed and has been completed.

The maximum amount that any one unit will be able to receive as reimbursement for accessibility-related retrofits is $XXXX.XX. You are responsible for any and all additional costs and expenses associated with your proposed retrofit work.

You will have until _____ to apply for these funds.

You are also responsible for hiring contractors and arranging the retrofit work, provided all work is performed by a Hawaii-licensed contractor.

If you would like to apply for funding, please complete the form below and send it back as follows:

[Name]
[Address]
[Fax]
[Email]

## REQUEST FOR FUNDS FROM THE NAPILI ACCESSIBILITY FUND

My name is _____ and I am the owner of

Unit _____.  My address is _____.  I

am seeking $_____ (amount not to exceed $XXXX.XX) to install the

following feature(s) in my unit (explain proposed accessibility-related retrofits):

_____

_____

I understand, acknowledge and agree that I am responsible for hiring and coordinating all contractors or other professionals to complete the proposed work. I agree to use Hawaii-licensed contractors or professionals. I further understand and agree that I will be responsible for all costs associated with the proposed work over and above the amount sought for reimbursement. I understand and agree that I will not receive reimbursement for any amount from the Fund until I have submitted documentation evidencing the completion of the proposed work.

_____

2

Signature

_____
Phone Number

_____
Email

**APPENDIX J**
**LIST OF AGGRIEVED PERSONS**

| Name | Amount of Monetary Damages | Defendants Responsible for Payment |
|------|---------------------------|-----------------------------------|
| Beverly Galarza, on behalf of and as guardian of Stephen Galarza | $48,000 | Albert C. Kobayashi, Inc., Martin V. Cooper, Warren S. Unemori, Inc., and Goodfellow Bros. LLC |
| Leslie Sanchez, on behalf of the estate of Rudy Sanchez | $24,000 | Albert C. Kobayashi, Inc., Martin V. Cooper, Warren S. Unemori, Inc., and Goodfellow Bros. LLC |
| Hector Sanchez[1] | $48,000 | Albert C. Kobayashi, Inc., Design Partners, Inc., Michael N. Goshi, Stanford Carr Development, LLC, SCD Wailea Fairways, LLC, Sato & Associates, and Goodfellow Bros. LLC |

---

[1] Leslie and Rudy Sanchez are not related to Hector Sanchez.

## APPENDIX K
## RELEASE OF ALL CLAIMS

In consideration of and contingent upon the payment of the sum of $[AMOUNT], in accordance with the Consent Order entered in *United States v. Albert C. Kobayashi, Inc., et al.*, No. 1:19-cv-531, by the United States District Court for the District of Hawaii, I hereby release and forever discharge all Defendants named in this action, including Defendants named under Federal Rule of Civil Procedure 19, from any and all liability for any claims, legal or equitable, I may have against them arising out of the issues alleged in this action as of the date of the entry of that Consent Order. I fully acknowledge and agree that this release of Defendants will be binding on my heirs, representatives, executors, successors, administrators, and assigns. I hereby acknowledge that I have read and understand this release and have executed it voluntarily and with full knowledge of its legal consequences.

_____

SIGNATURE

_____

PRINTED NAME

_____

ADDRESS

_____

DATE

## APPENDIX L
## ACKNOWLEDGMENT OF RECEIPT OF CONSENT ORDER

On _____, I received copies of and have read the Consent Order entered by the United States District Court for the District of Hawaii.  I have had all of my questions concerning the Consent Order and the Fair Housing Act answered to my satisfaction.

_____
(Signature)

_____
(Print name)

_____
(Position)

_____
(Date)

**APPENDIX M**
**CERTIFICATION OF FAIR HOUSING TRAINING**

      On _____, I attended training on the federal Fair Housing Act, including its requirements concerning physical accessibility for people with disabilities.  I have had all of my questions concerning the Fair Housing Act answered to my satisfaction.


_____
(Signature)


_____
(Print name)


_____
(Position)


_____
(Date)